[No. B207551. Second Dist., Div. Eight. Dec. 2, 2010.]

MITCHELL GROBESON, Plaintiff and Appellant, v.
CITY OF LOS ANGELES et al., Defendants and Appellants.

## Counsel

Traber & Voorhees, Theresa M. Traber, Bert Voorhees, Maronel Barajas; Hadsell Stormer Keeny Richardson & Renick, Dan Stormer and Natalie Nardecchia for Plaintiff and Appellant.

Burke, Williams & Sorensen, Richard R. Terzian, Ronald F. Frank and Robert J. Tyson for Defendants and Appellants.

## Opinion

**FLIER, Acting P. J.**—A jury rejected Mitchell Grobeson's claims that the City of Los Angeles (City) and Daniel Watson unlawfully retaliated against Grobeson in violation of the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) and Labor Code section 1101 et seq.; that City and Watson unlawfully discriminated against Grobeson and harassed him in violation of the aforesaid statutes; that City constructively discharged

Grobeson; and that appellant Watson unlawfully retaliated against Grobeson and harassed him in violation of FEHA and Labor Code section 1101 et seq.[1]

The trial court granted Grobeson's motion for a new trial on the ground of juror misconduct as to the discrimination, retaliation and constructive discharge claims in City's instance and also on the retaliation claim against Watson. The appeal is from this order.

Grobeson cross-appeals from the trial court's denial of his equitable claim for reinstatement as a police officer. Grobeson also cross-appeals from the order granting City's motion for summary judgment on Grobeson's claim under title 42 United States Code section 1983 and the order denying Grobeson's motion for a directed verdict. Finally, Grobeson claims that the trial court erred in making various evidentiary rulings and in denying his request for certain jury instructions.

We affirm the order granting the motion for a new trial and therefore dismiss the cross-appeal. We remand with directions to dismiss the claim for unlawful retaliation against Watson under the authority of *Jones v. Lodge at Torrey Pines Partnership* (2008) 42 Cal.4th 1158 [72 Cal.Rptr.3d 624, 177 P.3d 232].

## INTRODUCTION

Grobeson joined City's police force after graduating magna cum laude from Chapman College in 1981. After a fine start,[2] he states he was forced to leave the police department once his sexual orientation became known. This led to his first lawsuit against City, which was settled in 1993. One of the terms of the settlement called for his reinstatement with full seniority. We quote Grobeson's characterization of this settlement: "In essence, the 1993 Agreement set forth terms and conditions of employment that were unique to Grobeson, promising involvement in the LAPD's training, recruitment and outreach related to the gay and lesbian community, well beyond the typical LAPD sergeant."

Unfortunately, matters did not go well after 1993. Serious tensions materialized immediately between Grobeson and Watson, who at the time was commanding officer of the personnel group. In 1994, the police department initiated disciplinary proceedings against Grobeson; the charges centered on Grobeson's activities in the gay and lesbian communities. In 1996, after a

---

[1] We will refer to these claims, in order, as the retaliation, discrimination, constructive discharge and harassment claims.

[2] Among other distinctions, he was the first in his police academy class to make sergeant in 1986.

welter of charges and countercharges, Chief of Police Williams approved two significant suspensions of Grobeson totaling 195 days. These suspensions were set aside by Judge Carolyn Kuhl of the Los Angeles Superior Court in 1998. Grobeson filed for a stress-related disability retirement in 1995, which was granted in December 1997.

In the meantime, Grobeson filed the instant action in 1996. The operative complaint, filed in April 2003, went to trial against City and Watson on November 16, 2007. The jury returned its verdicts after a five-week trial on December 21, 2007.

## THE APPEAL

### 1. *The Juror Declarations*

One of the juror declarations filed in support of Grobeson's motion for a new trial was by Juror Keu Wu. Among other things, Wu's declaration stated that, during a break in the testimony of Watson, Juror Kishiyama got into a conversation with Wu, telling Wu that she liked Watson's voice and that Kishiyama ". . . liked listening to romantic novels on tape. Then she said, 'I made up my mind already. I'm not going to listen to the rest of the stupid argument.' I later told [J]uror [No.] 3, Melinda Jauregui, about the comment right before jury instructions were read." (Jauregui, who also filed a declaration, stated that she did not remember Wu telling her about Kishiyama's statement.) Wu's declaration was dated January 16, 2008.

On March 19, 2008, Attorney Laura Faer, one of Grobeson's lawyers, executed a declaration that stated, among other things, that she spoke with Kishiyama on the telephone on January 13, 2008. Faer identified herself and asked Kishiyama if she had any thoughts about the trial that she would be willing to share. Faer's declaration goes on to state: "4. One of her first comments to me was: 'I made up my own opinion in the second week of trial.' I typed this comment verbatim in my interview notes as she said it[.] [¶] 5. Throughout the conversation, she made it clear that the 'opinion' that she had reached in the second week of trial was to vote against the plaintiff. Among other things, she stated, 'I was very irritated when you were conducting the case.' "

Kishiyama executed a declaration on March 30, 2008, in which she denied making the statements attributed to her by Wu. Kishiyama's declaration states that she made up her mind only during jury deliberations, after the case was submitted to the jury.

## 2. The Trial Court's Ruling

Grobeson propounded four charges of juror misconduct. Grobeson claimed that four jurors were biased; that matters outside the record were considered by the jury in its deliberations; that there was a failure to deliberate; and that one juror prejudged the case and concealed bias on voir dire.

The trial court rejected all but one of these claims. The court granted the motion for a new trial on the ground that Juror Kishiyama committed egregious misconduct by discussing the merits of the case prior to deliberations and by prejudging the case.

In arriving at this ruling, the court relied on *Andrews v. County of Orange* (1982) 130 Cal.App.3d 944 [182 Cal.Rptr. 176] (*Andrews*) (disapproved on other grounds in *People v. Nesler* (1997) 16 Cal.4th 561, 582, fn. 5 [66 Cal.Rptr.2d 454, 941 P.2d 87]) and *Deward v. Clough* (1966) 245 Cal.App.2d 439 [54 Cal.Rptr. 68] (*Deward*), two decisions we discuss below.

The court found that Kishiyama made the statement we have set forth above to Wu prior to the time the case was submitted to the jury; the court found this to be "serious misconduct." The court noted that the vote on the harassment claim against City was 11 to one and, as to Watson, the vote on the harassment claim was 12 to zero; that the vote on the constructive discharge claim was 10 to two; and that the votes on all the other claims was nine to three. Citing *Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98 [95 Cal.Rptr. 516, 485 P.2d 1132], the court observed that where the verdict is nine to three, the disqualification for bias of any one of the majority jurors could have resulted in a different verdict. Thus, misconduct by one such juror was prejudicial.

The court rejected Kishiyama's declaration because it consisted "largely of statements by Ms. Kishiyama as to her mental processes and state of mind about how she reached her decision." This was inadmissible under Evidence Code section 1150, subdivision (a).[3] The court noted that Kishiyama denied making the statement to Wu. "On the other hand, there is a striking omission in Ms. Kishiyama's declaration—she does not deny making the statement to Ms. Faer that she 'made up my opinion on the second week of trial.' . . . The

---

[3] "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." (Evid. Code, § 1150, subd. (a).)

Faer declaration corroborates Mr. Wu's declaration that Ms. Kishiyama made the statement to him, and that it was made prior to the case being submitted to the jury."

The court concluded that Kishiyama had prejudged the case, that this was misconduct and that it was prejudicial. The court granted the motion for a new trial on all of the causes of action that had been decided by a nine-to-three vote, i.e., the discrimination and retaliation claims in City's instance and on the retaliation claim against Watson.

The court also granted the motion for a new trial on the constructive discharge claim, which was decided 10 to two, because of the "confusion on some of the questions" on the verdict form.

This means that the new trial order did not extend to the harassment claims against City, where the vote was 11 to one, and the same claim against Watson where the vote was 12 to zero.

## DISCUSSION

### 1. *The Governing Principles*

■ After citing Evidence Code section 1150, subdivision (a) (see fn. 3, *ante*), *People v. Hutchinson* (1969) 71 Cal.2d 342, 349–350 [78 Cal.Rptr. 196, 455 P.2d 132], goes on to hold: "This distinction between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved, has been advocated by commentators [citations], adopted by the Uniform Rules of Evidence [citations] and the Model Code of Evidence [citation], and has been the basic limitation on proof set by the leading decisions allowing jurors to impeach their verdicts. [Citations.] [¶] Although section 1150 does not alter the rule against impeachment of a verdict by the jurors, its limitation of impeachment evidence to proof of overt conduct, conditions, events, and statements, as suggested by the commentators, vitiates the major policy arguments supporting the common law rule. [Citation.] This limitation prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration."[4] (Fn. omitted.)

---

[4] City and Watson request that we take judicial notice of the legislative history of Evidence Code section 1150. We have no difficulty in interpreting section 1150 and therefore deny the request for judicial notice.

Cases where there was an overt act that in and of itself was improper, such as a juror reading a novel during the taking of testimony or a juror's consultation with an attorney for advice on the law applicable to the case (*In re Stankewitz* (1985) 40 Cal.3d 391, 398 [220 Cal.Rptr. 382, 708 P.2d 1260]), are the relatively easy ones to resolve. The matter becomes more difficult when it is not an overt act but a statement from a juror that is claimed to constitute misconduct. To be precise, there are usually two statements in such cases; there is a declaration (statement) by one juror who reports the statement of another juror. The focus is, of course, on the second statement. *In re Stankewitz* recognizes the difference between an overt act and a statement and provides guidance on how to deal with the problem when it is not an overt act but a juror's statement that is at issue.

*In re Stankewitz* involved a conviction for murder and robbery. One of the issues in the case was whether the robbery had been actually committed because, after taking the victims' wallets at the point of a gun, the defendant threw the wallets back after going through them. (*In re Stankewitz, supra*, 40 Cal.3d at p. 396.) At issue were the declarations of two jurors about statements made by another juror, a retired police officer, that under the foregoing facts a robbery had been committed.[5]

■ The court in *Stankewitz* noted that subdivision (a) of Evidence Code section 1150 specifically makes admissible *statements* made within or without the jury room. (See fn. 3, *ante*.) The court went on to hold: "Although this evidence may be received, it must be admitted with caution. Statements have a greater tendency than nonverbal acts to implicate the reasoning processes of jurors—e.g., what the juror making the statement meant and what the juror hearing it understood. They are therefore more apt to be misused by counsel in an effort to improperly open such processes to scrutiny. But no such misuse is threatened when, as here, the very making of the statement sought to be admitted would itself constitute misconduct. Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony [citation], or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*In re Stankewitz, supra*, 40 Cal.3d at p. 398, fn. omitted.)

---

[5] "While preparing the automatic appeal, petitioner's appellate counsel fortuitously received information that led him to obtain declarations of Marian Sparks and James F. Barbieri, who had served as jurors in the case. Each declaration stated in substance as follows: on several occasions during the guilt phase deliberations Juror Louis Knapp advised the other jurors that he had been a police officer for over 20 years; that as a police officer he knew the law; that the law provides a robbery takes place as soon as a person forcibly takes personal property from another person, whether or not he intends to keep it; and that as soon as petitioner took the wallets at gunpoint in this case he committed robbery, whether or not he intended to keep them." (*In re Stankewitz, supra*, 40 Cal.3d at p. 396.)

The phrase "the very making of the statement sought to be admitted would itself constitute misconduct" has two aspects to it. First, it is a statement about the juror's state of mind. Second, the juror's state of mind is revealed as biased.

A hypothetical will illustrate the dual nature of a juror's statement when "the very making of the statement sought to be admitted would itself constitute misconduct." (*In re Stankewitz, supra*, 40 Cal.3d at p. 398.) Assume that in a criminal trial one juror executes a declaration stating that during jury deliberations Juror X said as follows: "I knew from the first moment that I saw the defendant that he was guilty; he just *looked* guilty. And I never changed my mind." We take it that all would agree that X should not have served on this hypothetical jury.

■ It is certainly true that X's statement reports and describes a state of mind. That state of mind is that the defendant was guilty. But, if this would operate to exclude the juror's statement, it would never be possible to take action if a juror had made a statement that showed bias or made a statement that showed that the juror had prejudged the case. The point is that while evidence about "mental processes or reasons for assent or dissent" (*People v. Hutchinson, supra*, 71 Cal.2d at p. 350) is not admissible as a general proposition (*ibid.*), there is at least one state of mind that we *must* take into account and that is where the juror has prejudged the case or was biased. The duality in the juror's statement is that it describes a particular state of mind *and* it discloses bias or shows that the juror has prejudged the case. For the sake of convenience, we will refer to such a statement as a "statement of bias" and intend to include in this phrase a statement showing that the juror has prejudged the case.

To round out this discussion, a statement of bias is misconduct because bias is misconduct. This is what is meant by the phrase "the very making of the statement sought to be admitted would itself constitute misconduct."

Recognizing that the courts *will* consider a juror's mental state on the issue of bias is important in this appeal because it addresses City and Watson's central contention.

■ We digress briefly to note that in the instance of a statement of bias, one cannot speak of the juror as being *in a process* of reasoning, or decisionmaking. There is actually nothing "in process" because the juror has already made up his or her mind.

The two cases on which the trial court relied are good illustrations of the foregoing principles.

*Andrews* was an inverse condemnation case filed by 54 homeowners near Orange County's airport. (*Andrews, supra*, 130 Cal.App.3d at p. 954.) The trial lasted three months and ended with a verdict for the defendant. The jury spent four days visiting the homes during its deliberations; the misconduct occurred during these visits. We turn to the court's opinion: "Juror DeHaven committed serious acts of misconduct. During a field trip to inspect the homes, when an unidentified juror said: 'Those people already have enough money, why should they get more?' [J]uror DeHaven said: 'This whole thing is a big farce.' DeHaven admitted making the statement but sought to explain it by saying he was only expressing his feelings about the jury view of the homes. In the context in which the statement was made, however, the inescapable inference is that he was referring to the trial itself. The statement evidenced either a prejudgment of the case in violation of the statutorily required admonition (Code Civ. Proc., § 611), or a concealment of bias on voir dire or both." (*Id.* at p. 957.)

As in the case before us, the vehicles for conveying DeHaven's comments were juror declarations. It is noteworthy that the appellate court condemned DeHaven's comments in very strong terms.[6]

It would needlessly lengthen this opinion to cite further from *Andrews*. Instead, we note that the appellate court stressed the great importance of an unbiased jury, concluding that "the cost of a new trial is a small price to pay for the vindication of the constitutional right to a trial by a fair and impartial jury . . . ." (*Andrews, supra*, 130 Cal.App.3d at p. 960.)

*Deward* was a case involving a collision between the plaintiff's motorcycle and the defendant's car; the trial ended with a defense verdict. On the last of four trial days, "Mary Brock Deward, the mother of plaintiff, observed a happening in the courthouse corridor. This was reported in her affidavit on motion for a new trial. In it she said that at the beginning of the morning recess of the last day she had stepped from the courtroom out into the hallway. Some of the jurors came out of the courtroom and headed for the jury room but found the door of the jury room locked. She then overheard [J]uror Simard make a statement to two or three other men jurors to the effect: ' "I don't see why they don't open up the jury room now. We could

---

[6] "But even accepting his explanation that he was referring to the jury view of the homes, the statement still evinces prejudgment or bias. It indicates that DeHaven had already made up his mind and that the jury view was therefore a waste of time, a 'big farce.' This was egregious misconduct. The court is in session during a jury view and the view constitutes the taking of evidence. [Citations.] The fact that all of the other jurors may not have overheard DeHaven's statement does not rebut the presumption of prejudice from this prejudgment of the case or concealment of bias on voir dire." (*Andrews, supra*, 130 Cal.App.3d at p. 958.)

bring in a verdict already." The jurors present all laughed and the man who had spoken walked past me down the hall.' " (*Deward, supra*, 245 Cal.App.2d at p. 443.)

The appellate court concluded that Simard had prejudged the case: "On its face Mrs. Deward's affidavit shows that [J]uror Simard had neither kept his promise—made before he was selected as a juror—that he would keep an open mind, nor had he heeded the court's admonitions. On the contrary, even before hearing all of the arguments or any of the court's instructions, he had decided to vote for [defendant]. To assume that his remarks had been made in jest because the jurors to whom he spoke had laughed when he made his statement would be sheer guesswork. One could as readily assume they had laughed because they too had already made up their minds. Absent any counteraffidavit either from [J]uror Simard or from any of the other three male jurors on the jury, we must accept the fact, regretfully, that [J]uror Simard had prejudged the case. This was misconduct and it was serious." (*Deward, supra*, 245 Cal.App.2d at p. 444.)

We turn to City and Watson's contentions.

2. *Kishiyama's Statement During the Trial That She Had Already Made Up Her Mind Was a "Statement of Bias"*

City and Watson see no distinction between Kishiyama's statement that "I made up my mind during trial" (as reported by Wu and Faer) and her statement in her declaration that "I did not make up my mind until deliberations." But, City and Watson contend, the trial court took into consideration the first statement and refused to consider the second. City and Watson state that "this dichotomy is not supported anywhere in California law. Since the 'statements' upon which the trial court relied consisted solely of evidence of Ms. Kishiyama's mental processes, the trial court should have excluded admission of that evidence under *Evidence Code* § 1150, and gone no further."

As we have defined that term, Kishiyama's statement "I made up my mind during trial" was a "statement of bias"—actually, it showed that she had prejudged the case. City and Watson are mistaken that California law does not recognize the significance of such statements of bias and that California law does not treat such statements differently from statements of mental processes. As *Andrews* and *Deward* plainly show, California courts do treat statements of bias differently from other statements about a juror's mental

processes. Nor are *Andrews* and *Deward* isolated decisions.[7] Indeed, we are aware of no jurisdiction that does not distinguish statements of bias from other statements about a juror's mental processes. The right to an impartial jury could not be protected without a recognition of this distinction.

City and Watson contend that the "trial court failed to follow the principles in [*People v.*] *Hutchinson* and instead allowed Mr. Wu to upset the verdict of the whole jury by purporting to impugn Ms. Kishiyama's mental processes." While it is true that Kishiyama's "mental processes" were taken into consideration, that is only half the story. The other half is Kishiyama's statement that she had made up her mind during the second week of a five-week trial; that was a statement of bias, as we have defined that term. As we have shown above, her statement had a dual nature—it revealed her mental state *and* it showed that she had prejudged the case and thus had committed misconduct.

We are perplexed by the following two sentences in footnote 5 of City and Watson's opening brief: "Only if Ms. Kishiyama in fact pre-judged the case does a violation of *Code of Civil Procedure* § 611 cited by the trial court exist. [Citation to the trial court's ruling.] Ms. Kishiyama's actual thoughts are not open to sight and sound or subject to corroboration." If City and Watson mean to suggest that we can never know what Kishiyama actually thought, they are, of course, correct; this is pretty much the human condition, lacking, as we do, the gift of clairvoyance. But if they intend to suggest that we can blithely ignore what Kishiyama said, they are wrong. What Kishiyama said is our guide to what she thought. And there is nothing in either the text or the setting of her statements to Wu and Faer that suggests that she did not say what she actually thought.

City and Watson cite *People v. Hedgecock* (1990) 51 Cal.3d 395, 418–419 [272 Cal.Rptr. 803, 795 P.2d 1260], for the proposition that jurors cannot be examined on their own mental processes or on what other jurors said in the deliberations. This is true as a general proposition but it has no application to this case. We do note, however, that *People v. Hedgecock* also had this to say: "In rare circumstances a statement by a juror during deliberations may itself be an act of misconduct, in which case evidence of that statement is admissible. (*In re Stankewitz, supra,* 40 Cal.3d at p. 398.)" (*Id.* at p. 419.)

---

[7] "For a juror to prejudge the case is serious misconduct." (*Clemens v. Regents of University of California* (1971) 20 Cal.App.3d 356, 361 [97 Cal.Rptr. 589]; accord, *People v. Brown* (1976) 61 Cal.App.3d 476, 480 [132 Cal.Rptr. 217].) The California Supreme Court has spoken out strongly on the subject of bias and prejudice. " 'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution.' " (*Weathers v. Kaiser Foundation Hospitals, supra,* 5 Cal.3d at p. 110, citing *People v. Galloway* (1927) 202 Cal. 81, 92 [259 P. 332].)

We do not agree that this case is like *People v. Orchard* (1971) 17 Cal.App.3d 568, 573–574 [95 Cal.Rptr. 66], where a juror got into an altercation with the foreman of the jury who thought that the juror was not keeping an open mind.[8] Kishiyama's two statements are stark in their directness and simplicity—she made up her mind in the second week of trial, with three more weeks of trial ahead. There isn't even a semblance of similarity between Kishiyama's statements and that of the juror discussed in *People v. Orchard*.

### 3. *Kishiyama's Prejudgment of the Case Improperly Influenced the Verdict*

City and Watson contend that Kishiyama's statements are not likely to have influenced the jury. Specifically, the statement to Faer was made after the trial was over and the statement to Wu was an "isolated single statement, reportedly made outside the jury room to a single juror, Mr. Wu."

■ This contention is based on two misconceptions. First, under Evidence Code section 1150 the question is whether the statement "is likely to have influenced the *verdict* improperly" (italics added; see fn. 3, *ante*), not whether the jury or individual jurors were influenced by the statement. Second, no one claims that Kishiyama's *statement* had an influence on the verdict. The point is that Kishiyama's prejudgment of the case was an improper influence on the verdict.

■ "The guarantee is to *12* impartial jurors. . . . [¶] For a juror to prejudge the case is serious misconduct." (*Clemens v. Regents of University of California, supra,* 20 Cal.App.3d at pp. 360–361.) Not only does juror misconduct raise a presumption of prejudice (*People v. Tafoya* (2007) 42 Cal.4th 147, 192 [64 Cal.Rptr.3d 163, 164 P.3d 590]), in this case the trial court found that the loss of one biased juror on votes of nine to three actually prejudiced Grobeson. City and Watson's argument that Kishiyama's statements were of no moment is therefore mistaken.

### 4. *Kishiyama's Statements Were Not Hearsay*

■ "Under the Evidence Code, no hearsay problem is involved if the declarant's statements are not being used to prove the truth of their contents but are being used as circumstantial evidence of the declarant's mental state." (Assem. Com. on Judiciary com., 29B pt. 4 West's Ann. Evid. Code (1995 ed.) foll. § 1250, p. 281.)

---

[8] "Stripped of its inadmissible portions, the sum total of [J]uror Bosman's affidavit simply describes an account of interchange between jurors in which the foreman sought to persuade Mrs. Bosman to maintain an open mind. To permit inquiry as to the validity of a verdict based upon the demeanor, eccentricities or personalities of individual jurors would deprive the jury room of its inherent quality of free expression." (*People v. Orchard, supra,* 17 Cal.App.3d at p. 574.)

The exchange of words and telegrams by parties negotiating a contract ". . . were verbal acts establishing a legal relationship. Wigmore points out that evidence of this type '. . . is circumstantial, not testimonial; and it is therefore not obnoxious to the Hearsay Rule, nor needs for its admission any Exception to that rule.' (6 Wigmore on Evidence (3d ed. 1940), § 1790, p. 239.) 'To such a use [to prove a specific state of mind] . . . the Hearsay Rule makes no opposition, because the utterance is not used for the sake of inducing belief in any assertion it may contain. The assertion, if in form there is one, is to be disregarded, and the indirect inference alone regarded. This discrimination, though well accepted in the law, is easy to be ignored, and it needs perhaps to be emphasized.' " (*Skelly v. Richman* (1970) 10 Cal.App.3d 844, 858 [89 Cal.Rptr. 556].)

The various comments made by Kishiyama were circumstantial evidence of her bias against Grobeson. They were therefore not hearsay.

### 5. *The Trial Court Did Not Err in Refusing to Consider Kishiyama's Declaration About Her Intentions*

Kishiyama's declaration chronicled the course of her mental reactions to the evidence presented and to the other jurors' comments during deliberations. This is exactly the kind of material that *People v. Hutchinson, supra,* 71 Cal.2d 342, 349–350, proscribes. Kishiyama's declaration is nothing other than a chronicle of her mental processes, presented to refute Grobeson's claim that she was biased against him. The trial court ruled correctly under *Hutchinson* in excluding this declaration.

### 6. *City and Watson Are Mistaken in Dismissing* Andrews *and* Deward

City and Watson dismiss *Andrews* and *Deward* as inapplicable because neither case mentions or discusses Evidence Code section 1150.

We find this argument to be without merit. For one, *Andrews, supra,* 130 Cal.App.3d 944 cites and discusses Evidence Code section 1150 at pages 953–954. And *Deward* predates the modern Evidence Code, if only by one year.

But, more importantly, the right to an unbiased jury predates Evidence Code section 1150. " 'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution.' " (*People v. Galloway, supra,* 202 Cal. 81, 92.) In a word, while it is better practice to refer to Evidence Code section 1150 when discussing juror misconduct (and *Andrews* did so), the right to an unbiased juror is not predicated on section 1150.

In another portion of their brief, City and Watson contend that Kishiyama's conduct "does not remotely resemble that of the jurors at issue in either *Andrews* or *Deward*." We do not agree with City and Watson.

We begin with the standard of review. "Upon appellate review of an order granting a new trial, 'all intendments are in favor of the action taken by the lower court [and] the affidavits in behalf of the prevailing party are deemed not only to establish the facts directly stated therein, but all facts reasonably inferred from those stated.' [Citation.]" (*Weathers v. Kaiser Foundation Hospitals, supra*, 5 Cal.3d 98, 106.) " 'When an issue is tried on affidavits . . . and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed.' [Citations.]" (*Id.* at p. 108.)

■ In this case, Kishiyama stated that she made up her mind during the second week of trial. This is far more unequivocal than the statement made during a view of the scene that " '[t]his . . . is a big farce' " (*Andrews, supra*, 130 Cal.App.3d at p. 957) and saying that the jury was ready to bring in a verdict (*Deward*). The latter two statements require some interpretation and the drawing of inferences. But the statement that Kishiyama had made up her mind about the case during the second week of trial requires neither interpretation nor the drawing of inferences. It is a flat, unadorned statement that this juror prejudged the case long before deliberations began and while a great deal more evidence had yet to be admitted.

Putting Kishiyama's statement down as an "isolated comment" and one that was heard by only one juror, as City and Watson do, ignores reality, as well as the standard of review. The reality is that this juror was biased and ignored every instruction on this subject by the trial court. And the standard of review requires not only that we accept the trial court's resolution of the facts, we must also draw the reasonable inferences that flow from Kishiyama's statement. One logical inference is that she stopped listening to the testimony, which rendered, most unfortunately, the trial a nullity. Finally, that Kishiyama "did not engage in any of the extraneous misconduct" such as found in *Andrews* is beside the point. The misconduct that she did commit needed no amplification.

We find both *Andrews* and *Deward* on point, authoritative and helpful.

7. *In Attempting to Rehabilitate Kishiyama, City and Watson Ignore the Standard of Review*

City and Watson contend that other than the two statements that Kishiyama made to Wu and Faer, "there is no reason in the record to conclude that she

had closed her mind as to any issue in the case." City and Watson then turn to Kishiyama's declaration which the trial court correctly concluded cannot be considered because it consists of an account of Kishiyama's mental processes prior to and during jury deliberations. (*People v. Hutchinson, supra*, 71 Cal.2d 342, 349–350.)

We are required to accept as true the facts directly stated in Wu's and Faer's affidavit and also to draw all reasonable inferences from those facts. (*Weathers v. Kaiser Foundation Hospitals, supra*, 5 Cal.3d 98, 106.) It is therefore a given that Kishiyama had made up her mind by the second week of trial, which necessarily means, to use City and Watson's phrase, that she had "closed her mind" to *all* of the issues in the case. We will not, as we cannot (*People v. Hutchinson, supra*, 71 Cal.2d at pp. 349–350), turn to Kishiyama's declaration about her mental processes to look for evidence to contradict this fundamental fact.

City and Watson present three scenarios that they claim are reasonable possibilities. First, Kishiyama made the statement in question, but did so right after closing arguments. This is so, City and Watson contend, because Kishiyama also said that she would not listen to any "stupid arguments." Second, she made the statement during a break in jury deliberations. Third, she did not make these statements at all.

The flaw in this approach is that it squarely contradicts the standards we must apply. We do not seek out inferences that, if true, would cause us to reverse the trial court's order granting the motion for a new trial. All intendments favor the order granting the new trial (*Weathers v. Kaiser Foundation Hospitals, supra*, 5 Cal.3d 98, 106), and when, as here, the trial court has resolved factual conflicts, we will not disturb the trial court's decision. (*Id.* at p. 108.) That is, we will not engage in the speculations that City and Watson propose. Importantly, the trial court found that Kishiyama made the statement to Wu during the second week of trial, a fact that her statement to Faer corroborates. It is therefore out of the question to conclude on appeal that Kishiyama never made the statement at all, or that she made it at any time other than the second week of trial.

We cannot agree with City and Watson that the court's repeated admonitions to the jury not to form an opinion about the case cured Kishiyama's misconduct. In the first place, the trial court obviously did not think so. It scarcely needs to be pointed out that the trial court was in the best position to judge whether its admonitions cured the misconduct. Unfortunately, it stands to reason that a juror who is wrongheaded enough to make up her mind two weeks into a five-week trial, and even tells another juror about it, is not going to listen to the trial court's admonitions to keep an open mind.

Finally, City and Watson question the credibility of Faer's declaration on the ground that it should have been executed and filed much earlier in the posttrial process. Since the trial court found Faer's declaration to be credible, we must accept that decision. (*Weathers v. Kaiser Foundation Hospitals, supra,* 5 Cal.3d at p. 108.) This is not the forum for reweighing Faer's credibility.

## 8. *The Retaliation Claim Against Appellant Watson*

 City contends that *Jones v. Lodge at Torrey Pines Partnership, supra,* 42 Cal.4th 1158 (*Jones*) requires the dismissal of the retaliation claim against Watson. *Jones* held that a retaliation claim may be asserted only against an employer and may not be made against a supervisor. (42 Cal.4th at pp. 1167–1168.) We have asked the parties to brief whether *Jones* should be applied retroactively to Grobeson's claim, which arose in 1993 to 1996, and they have done so.

Grobeson contends that his retaliation claim, at the time it arose, was based on Labor Code section 1101 et seq. (specifically former § 1102.1) and not on FEHA and that for this reason *Jones*, which addressed retaliation claims arising under FEHA, is not applicable. Grobeson goes on to contend that when the Legislature amended FEHA in 1999 to incorporate the Labor Code's provisions, the Legislature did not "abrogate the individual liability available under the prior Labor Code." Finally, Grobeson claims that he has a "vested right to sue Watson for retaliating against him."

 The general rule is that judicial decisions are given retroactive effect. (*Brennan v. Tremco Inc.* (2001) 25 Cal.4th 310, 318 [105 Cal.Rptr.2d 790, 20 P.3d 1086].) This rests on the theory that the new decision does not really pronounce "new" law but rather states what the law always was.[9] But considerations of fairness and public policy may require that the decision is given prospective effect only. (*Planning & Conservation League v. Department of Water Resources* (1998) 17 Cal.4th 264, 274 [70 Cal.Rptr.2d 635, 949 P.2d 488].) As an example, when the new decision overrules clear past precedent or disrupts a practice long accepted and widely relied on, the

---

[9] "Blackstone believed that judges do not 'create,' but instead 'find' the law. A decision interpreting the law, therefore, does no more than declare what the law had always been. An overruling decision, under this theory, also does no more than declare the law—albeit in a more enlightened manner. From this declaratory nature of a judicial decision, the following rule emerges: An overruled decision is only a failure at true discovery and was consequently never the law; while the overruling one was not 'new' law but an application of what is, and had been, the 'true' law." (*Casas v. Thompson* (1986) 42 Cal.3d 131, 140, fn. 3 [228 Cal.Rptr. 33, 720 P.2d 921].)

decision may be made prospective only.[10] (*People v. Hicks* (1983) 147 Cal.App.3d 424, 427 [195 Cal.Rptr. 127], citing *United States v. Johnson* (1982) 457 U.S. 537, 552 [73 L.Ed.2d 202, 102 S.Ct. 2579].) This is the principle that Grobeson is actually invoking; there is no basis in this case for the claim that he has a "vested" right to sue under the Labor Code.

Grobeson cannot have relied on law imposing under FEHA liability on individuals for the good reason that authoritative decisions so providing simply did not exist. In *Caldwell v. Montoya* (1995) 10 Cal.4th 972, 978–979, footnote 3 [42 Cal.Rptr.2d 842, 897 P.2d 1320], handed down in July 1995, the court noted that while there were scattered appellate opinions that assumed without discussing that an individual could be liable under FEHA, "no prior published California decision has directly considered whether FEHA imposes personal liability on an individual employee or manager who causes or assists a covered 'employer' to violate the statute's prohibitions against discriminatory hiring, firing, and personnel practices." The court called this a "broad and difficult question," which it declined to address. (*Ibid.*) It did so, however, in *Reno v. Baird* (1998) 18 Cal.4th 640 [76 Cal.Rptr.2d 499, 957 P.2d 1333], when it sided with the Court of Appeal's decision in *Janken v. GM Hughes Electronics* (1996) 46 Cal.App.4th 55, 79–80 [53 Cal.Rptr.2d 741], which had held that an individual cannot be liable under FEHA for age discrimination. Significantly, the *Janken* court noted that federal courts construing the Civil Rights Act of 1964 (Pub.L. No. 88-352 (July 2, 1964) 78 Stat. 241) reached the identical conclusion. (*Janken*, at pp. 67–70.)

Thus, by the time *Jones* arrived on the scene, the tide was both clear and strong that individual liability cannot be imposed under FEHA. In sum, the initial uncertainty of the early 1990's yielded to the results of *Reno v. Baird*, and *Jones*. It is therefore evident that this is not a situation when Grobeson could have relied on clear precedent and long-established practice.

■ Grobeson claims that we should apply the law as it was in 1993 to 1996 because that is when the claim arose. This is a mistaken view. As Chief Justice Marshall explained in *United States v. Schooner Peggy* (1801) 5 U.S. 103, 110 [2 L.Ed. 49],[11] if subsequent to the trial court's judgment and before the decision of the appellate court a law intervenes, which "changes the rule which governs," the appellate court must apply the new rule. In other words, courts must apply the law that is in force when the decision is made. An

---

[10] It is also possible to make a decision purely prospective, in which event the new rule does not apply even to the parties before the court. (*Linkletter v. Walker* (1965) 381 U.S. 618, 621–622 [14 L.Ed.2d 601, 85 S.Ct. 1731].)

[11] This venerable case is cited and discussed in the seminal decision of *Linkletter v. Walker,* *supra*, 381 U.S. at pages 625–626.

exception *may* be made to this when the new rule is a clear break with the past. (*United States v. Johnson, supra*, 457 U.S. at p. 549.) As we have seen, there was no such clear break in this case.

 Finally, it is clear that in *Jones* the court analyzed the relevant statutes in order to determine what the Legislature intended to accomplish. This precludes prospective application of *Jones*. "Whenever a decision undertakes to vindicate the original meaning of an enactment, putting into effect the policy intended from its inception, retroactive application is essential to accomplish that aim." (*People v. Garcia* (1984) 36 Cal.3d 539, 549 [205 Cal.Rptr. 265, 684 P.2d 826].)

For the reasons stated, we follow the general rule and hold that *Jones* requires the dismissal of the retaliation claim against Watson.

9. *Conclusion*

Because of our disposition of the appeal, it is not necessary to address Grobeson's contention that, as an alternate basis for granting the new trial, certain conflicts in the special verdicts returned by the jury also require a new trial.

The order granting the new trial is affirmed.

## THE CROSS-APPEAL

1. *The Cross-appeal Is Dismissed*

 A cross-appeal is a precautionary appeal taken by the party whose motion for a new trial has been granted. The cross-appeal is "protective" because it ensures the right to obtain appellate review of the judgment if the order granting a new trial is reversed. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2010) ¶ 3:169, p. 3-69 (rev. # 1, 2009).) (If no cross-appeal has been taken and the new trial order is reversed, the judgment is automatically reinstated (*Sanchez-Corea v. Bank of America* (1985) 38 Cal.3d 892, 910 [215 Cal.Rptr. 679, 701 P.2d 826]).)

"The cross-appeal from the judgment is only operative if the order granting the new trial is reversed thus reinstating the judgment." (*Alhambra Cons. Mines, Inc. v. Alhambra Shumway Mines, Inc.* (1966) 239 Cal.App.2d 590, 600 [49 Cal.Rptr. 38].) "The reviewing court will first consider the main appeal from the order granting a new trial and will decide the cross-appeal from the judgment only if it reverses the order. [Citations.] But if, as is usual, the order granting a new trial is affirmed, the effect is that there is no longer a

final judgment. Hence, the merits of the cross-appeal will not be considered, and the appropriate order is a dismissal of that appeal." (9 Witkin, Cal. Procedure (5th ed. 2008) Appeal, § 593, pp. 670–671, cited, inter alia, in *Sandco American, Inc. v. Notrica* (1990) 216 Cal.App.3d 1495, 1498 [265 Cal.Rptr. 587].)

■ We note that one of the contentions raised in the cross-appeal is that the trial court erred in granting City's motion for summary adjudication of Grobeson's claim under title 42 United States Code section 1983. An order granting summary adjudication is reviewable in an appeal from a final judgment. (*Jennings v. Marralle* (1994) 8 Cal.4th 121, 128 [32 Cal.Rptr.2d 275, 876 P.2d 1074].) In light of the order granting the motion for new trial, there is now no longer a final judgment. Thus, review of the order granting summary adjudication must await the entry of a final judgment.[12]

For the reasons stated, we dismiss the cross-appeal.

2. *The Trial Court's Order Denying Equitable Relief Is Vacated and Set Aside*

In the same order in which the trial court granted the motion for a new trial, the trial court also denied certain equitable relief sought by Grobeson. Grobeson sought five separate orders, chief of which was an order directing that Grobeson be reinstated with the Los Angeles Police Department.

■ A final order granting a new trial vacates the verdict and places the cause in the same condition as before trial. (*Guzman v. Superior Court* (1993) 19 Cal.App.4th 705, 707–708 [23 Cal.Rptr.2d 585]; see generally 8 Witkin, Cal. Procedure, *supra*, Attack on Judgment in Trial Court, § 126, pp. 718–719.) A final order granting a motion for new trial exhausts the trial court's jurisdiction. (*Wenzoski v. Central Banking System, Inc.* (1987) 43 Cal.3d 539, 542 [237 Cal.Rptr. 167, 736 P.2d 753].) Once the court granted the motion for a new trial, it lost jurisdiction to enter further substantive orders (*ibid.*), such as the order denying equitable relief.

Accordingly, we vacate and set aside the trial court's order denying Grobeson's claims for equitable relief.

---

[12] City and Watson's request that we take judicial notice of certain documents relating to the motion for summary judgment is denied.

## DISPOSITION

The order granting the motion for a new trial is affirmed. The cross-appeal is dismissed. The case is remanded with directions to dismiss the retaliation claim against Watson. The parties are to bear their own costs on appeal.

Grimes, J., and O'Connell, J.,* concurred.

A petition for a rehearing was denied January 3, 2011, and the petition of defendants and appellants for review by the Supreme Court was denied March 16, 2011, S189317.

---

*Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.