Filed 9/24/13  P. v. Villarreal CA6

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JUVENTINO G. VILLARREAL,<br><br>    Defendant and Appellant. | H037177<br>(San Benito County<br>Super. Ct. No. CR0900317) |

## 1.  INTRODUCTION

Defendant Juventino G. Villarreal was charged in an amended information with five kinds of sexual offenses, some repeated, involving his stepdaughter, D.[1]  The charged offenses were continuous sexual abuse of a child under 14 (Pen. Code, § 288.5; count 1)[2] between the spring of 1998 and the fall of 2005, lewd and lascivious touching of a child under 14 (§ 288, subd. (a); counts 2, 3, 4, 5, 7, 8, 9, 13), oral copulation with a child who was under 14 and more than 10 years younger than defendant (§ 288a, subd. (c)(1); counts 6, 10, 11, 12, 14), sexual penetration with a foreign object (§ 289, subd.

---

[1]  To protect the victim's privacy, we will refer to her as "D" and will not give the names of her mother, uncle, or grandmother.

[2]  Unspecified section references are to the Penal Code.

(a)(1); count 15); and aggravated sexual assault on a child who is under 14 and at least seven years younger than defendant by foreign object penetration (§ 269, subd. (a)(5); count 16). The amended information alleged that the offenses occurred in four different locations in Hollister and it alleged a season and year during which each of the 15 separate offenses (counts 2 through 16) occurred.

The jury found defendant guilty as charged, except for finding him not guilty of alternative count 1 (continuous sexual abuse), as well as counts 4 (lewd touching in the winter of 2001), 8 (lewd touching in the winter of 2003), and 11 (oral copulation in the winter of 2003). The trial court sentenced defendant to an indeterminate term of 15 years to life on count 16 for the aggravated sexual assault, with 24 consecutive years for the remaining counts.

On appeal, defendant raises the following claims: (1) jury misconduct; (2) insufficient evidence of force or duress to support counts 15 and 16; (3) that the trial court erred in omitting a unanimity instruction; (4) that the trial court erred in failing to give a lesser included offense instruction; and (5) that the trial court should not have imposed separate punishments on alternative counts 7, 9, and 13.

We will conclude that the judgment must be reversed because the presumption of prejudice that arises from juror misconduct—in this case pre-deliberation discussions among two jurors who declared their belief that defendant was guilty prior to hearing the defense—has not been rebutted. To provide guidance if defendant is retried, we also will conclude that (1) there was substantial evidence to support counts 15 and 16, (2) count 15 was a necessarily included offense of count 16, and (3) there was no instructional error relating to count 15 as a lesser included offense of count 16.

2

## 2. THE TRIAL

### A. PROSECUTION EVIDENCE

Although the jury was not instructed to find the locations of the different offenses, it will facilitate review of the evidence to group the charges chronologically by their four locations.

### (1). Defendant's residence before cohabitation (count 2)

Count 2 (spring 1998) alleged lewd touching before D and her mother began living with defendant. The jury found defendant guilty of count 2.

D's mother remembered meeting defendant in 1997 or 1998. Defendant was born in 1955. D, who was born in 1992, recalled being five years old when her mother began dating defendant. One day in the early afternoon, while her mother was at work, D was sitting on defendant's bed and watching TV in a room he was renting in Hollister. Defendant asked her to take her hand and rub his penis through his clothing. He took her hand and placed it on his groin area. She was confused and scared because she knew it was a private part that other people should not touch. She does not remember her age. She was about to finish kindergarten. "It felt like summer, because it was—it wasn't hot, but it wasn't cold." It was in spring or summer.

### (2). First apartment where D lived with defendant (counts 3-6)

Counts 3 (fall 2000), 4 (winter 2001), and 5 (spring 2001) alleged lewd touching in the first apartment that defendant shared with D and her mother. Count 6 (fall 2000) alleged oral copulation in that apartment. The jury found defendant guilty of all of these counts, except count 4.

According to D's mother, she married defendant in July 2000. Defendant filed for divorce a month or two after they got married. They kept living together off and on for years. Defendant was very persistent in calling her and repeatedly told her that she

3

belonged to him.  D recalled that her mother married defendant the summer after she was in fifth grade (which would have been in 2002).

As D recalled, when she was in third grade, she and her mother moved into a Hollister apartment with defendant.  In that apartment, one morning after D's mother had gone to work, defendant was under the covers in bed watching TV.  He asked D to bring him some coffee, so she did.  Then he asked her to get in bed with him.  She did.  He was naked.  He started touching and rubbing her and asked if it felt good.  He undressed her.  He touched her chest and vagina and rubbed his groin on her vagina.  It ended with him ejaculating.  He told her "that was supposed to happen."  She just went with it.  She remembered it being in the spring or summer.

D testified that this kind of encounter happened "a lot.  If I were to give it a number, I'd say like, you know—like, ten times or even more."

One time when D was in the third grade, after defendant had finished showering, he asked D to come into the bathroom.  He was still naked.  He put his penis in her mouth and ejaculated.  She "got really freaked out" and he told her, " 'don't worry.  That's supposed to happen.' "  That only happened once in that particular apartment.

D testified that defendant did not do anything to make D feel uncomfortable around Thanksgiving or Christmas while living in that apartment.  "[S]tuff like that would never happen around, you know, the holiday time, or even, like, around my birthday.  Like not—not in November or December, or January or February."  D's mother took vacation time and was home more during that time of year.

D's mother always had two jobs, as did defendant.  He worked at a liquor store and a place called Couch.  D recalled that defendant had a lot of weekends off and her mother did not.

**(3).  Second apartment where D lived with defendant (counts 7-12)**

Counts 10 (fall 2002), 11 (winter 2003), and 12 (spring 2003) alleged oral copulation in the second apartment that defendant shared with D and her mother.  Counts 7 (fall 2002), 8 (winter 2003), and 9 (spring 2003), as the prosecutor explained, charged lewd and lascivious touching as an alternative to the oral copulation charges 10 through 12.  The jury found defendant guilty of all of these counts, except counts 8 and 11.

When D was in the fifth grade, she, her mother, and defendant moved to another apartment on the same street as the first apartment they shared.  "There was a lot more oral copulation that I remember happened at that apartment," she testified.  Her mother and defendant had their own bathroom in their bedroom.  Defendant would come into D's bathroom and "try to be romantic about it" and put his arm around her.  He would be fully dressed at first and then he would drop his pants.  Sometimes D was dressed.  Other times they got into her shower together.  She could not say how many times it occurred.  "Like, number-wise, it would be probably, maybe more than ten oral cop."  From these encounters, she remembered two colognes he wore and how he chewed Winterfresh gum.

She recalled one occasion when defendant got upset because he could not ejaculate when she was performing oral sex.  She asked him what she had done wrong.  In a forceful voice, he told her to get out.

After leaving defendant, her mother and D lived with her aunt and later moved to Los Baños for a short time.

**(4).  Defendant's apartment in Hollister (counts 13-16)**

Count 14 (summer 2005) charged oral copulation.  The prosecutor told the jury that count 13 (summer 2005) charged lewd and lascivious touching as an alternative to count 14.  Count 15 (fall 2005) charged sexual penetration, and count 16 (fall 2005) charged aggravated assault on a child based on sexual penetration.  The jury found defendant guilty of all of these counts.

D and her mother returned from Los Baños before D started eighth grade and stayed in defendant's new Hollister apartment. According to D, defendant started back up again. When D's mother was off to work, he wanted to touch and kiss her a lot. "I remember him humping me a lot." She slept on a futon in the living room. On the futon, "he liked to hump me with his clothes on. But when we were in his bedroom upstairs, he liked to hump me with his clothes off. And I guess at that point, he—he was a little more forceful when we were upstairs." She watched TV upstairs in his bedroom. He kissed her, put his arm around her, and removed her clothes on the bed. He removed his shirt and hers.

The humping was like intercourse without his penis inside her. They never had intercourse. He ejaculated on her or on his underwear, but not on the sheets.

One day "when I was wearing my jeans, he was a bit too aggressive and, like, he ripped off the whole—like, the loop where you put the belt in your jeans." He was unclothed at the time. He rubbed his penis on the entrance of her vagina. He inserted a finger inside her vagina and she got really scared because it was a weird feeling. She testified that she "was, like, wiggling and screaming and stuff. And he would usually try and apply pressure on me to keep me on the bed because he was on top. When I felt his finger in there and I was, like, screaming, I got out and I left him."[3] She did not know if it was supposed to be pleasurable or painful. It was just weird.

_____

[3] When D began describing a time that defendant grabbed her pants and ripped off a belt loop, the prosecutor asked, "What happened on that occasion?" D answered: "The day that he ripped off the little part of my pants, I remember that, you know, he was unclothed and I was unclothed. He would rub his penis on the entrance of my vagina, but never inside. He never inserted his penis inside. We never had intercourse, but he—he— he inserted one of his fingers inside of my vagina and I got really scared because that was a weird feeling. And, like, I was, like, wiggling and screaming and stuff. And he would usually try and apply pressure on me to keep me on the bed because he was on top.

*(Continued)*

6

He always asked her if it felt good and if she liked it. He told her that she was so good.

On one occasion in that apartment, her mother almost witnessed one of their encounters. Defendant and D were both in the kitchen joking when defendant pulled down his pants, waved his penis at D, and told her to put it in her mouth. She complied and he "did his thing." That time he ejaculated in his underwear, not in her mouth. Through half-drawn blinds on the kitchen window, D saw her mother drive up and park when defendant had just finished ejaculating. D got scared and ran upstairs.

**(5). Disclosure**

During car rides when her mother was not around, defendant said to D: "'[T]his is our thing. Whatever happens between us stays between us and nobody else needs to know.'" "'[Y]ou wouldn't want to get me in trouble.'"

D testified that she "didn't want to get in trouble. I didn't want him in trouble and I don't want my mom to be without a husband." She was concerned about getting her dad into trouble, but she was more concerned about her mother being alone. Her mother really loved him.

Her mother encouraged D to give defendant cards and gifts. "[M]y mom told me that, you know, we should be thankful that he's in our life, so we should buy him things to show that." Her mother insisted that D give him cards in July 2004, April 2005, and April 2007, expressing her love for daddy, and slippers in 2008 saying "'world's greatest dad.'"

D recalled telling her mother about defendant molesting her on two occasions before they contacted the police in January 2009.

---

When I felt his finger in there and I was, like, screaming, I got out and I left him. Got like, too[] scared."

According to D, one time her grandmother caught her reenacting with a younger male cousin what defendant had done to her. D kissed her cousin and rubbed on him. He was on top of her. She did not touch his penis. He was wearing diapers at the time. That cousin wore diapers for a long time. Her grandmother came in and yelled at her and asked where she learned that behavior. D told her grandmother that it was from defendant, who was touching her private parts. D said that her grandmother told her mother about the incident when her mother returned from work, and D told her mother that defendant was touching her private parts.[4]

D's mother testified that she was unaware that D had a sexual encounter with one of her cousins. When D's mother was with defendant, he seemed to her to act like "a dad" to D.

D also said that she talked to her maternal uncle about these incidents when she was entering high school. Her uncle testified that she seemed upset once as he was returning her home from a visit. He asked her what was bothering her, and she said there had been some sexual misconduct involving her former stepfather. D also told him about sexually inappropriate conduct with her cousin. Her uncle's initial reaction was to go to the police. D, however, was very concerned about her mother. Her uncle agreed to let her talk to her mother about it first.

D recalled telling her mother that defendant was touching her in places he should not be touching. D's mother recalled that her brother called her in 2005 or 2006 about defendant molesting D. After D's uncle dropped her off and left, D's mother asked D

---

[4] D could not recall how old she was at the time of this incident. She remembered that they were living in their first shared apartment (which began in 2000). She also estimated that she was five or six years old at the time (which would have been in 1998), which would have made her cousin three years old.

what she wanted to do about it. D cried a lot and said she did not want to do anything about it. D's mother believed her, but did not want to put her through the legal process.

D's mother told her brother by telephone that they were not going to do anything about the molests, so he called CPS himself. They told him they would investigate but could not update him with their findings.

CPS contacted D in her freshman year of high school. She told them nothing had happened.

According to D's mother, D then had a nervous breakdown in January 2009 and accused her of not protecting her against defendant's sexual abuse. They contacted the San Benito County Sheriff's office in January 2009 and reported the molestation. D at first told a detective that the touching stopped after sixth grade once they moved out. She said that she did not talk about other incidents because she was scared and it was hard to talk about.

Carl Lewis testified as an expert on child sexual abuse accommodation syndrome. He described various behaviors typical of child molestation. Secrecy is common, with the offender reinforcing to the child that what happened should stay secret. The child often feels helpless to resist, particularly when there is a previous dependence relationship. The child may accommodate the situation by continuing to get along with the offender, while manifesting distress in other ways. Domestic martyrdom describes the child sacrificing himself or herself to keep the family together. Disclosure may be delayed, unconvincing, and conflicted. Most child abuse is not disclosed during childhood. After disclosure there may be retraction due to a strong reaction from the government and possibly removing the child from the home. Lewis emphasized that the "syndrome" is not a diagnostic tool.

## B. DEFENSE EVIDENCE

Defendant acknowledged having an on and off relationship with D's mother between late 1998, when they started dating, and late 2002 or early 2003, when he ended

9

their physical relationship. They were married in July 2000, separated three months later, and got back together after getting divorced. He admitted that D and her mother stayed with him in his apartment in Hollister when they returned from Los Baños.

Defendant worked two jobs at the time, one as a warehouse supervisor for a beer distributor and the other at a liquor store.

Defendant regarded D as his daughter. He denied assaulting her and engaging in oral copulation or digital penetration. It was not his practice to have her bring him coffee in bed.

Defendant's son, Juventino Villarreal III, was 31 years old at the time of trial in July 2010. He had known D since 1998 or 1999, though they had not lived together. He saw positive interactions between D and defendant. D showed defendant affection and did not shun him.

Defendant's son's wife had seen D interact like a caring daughter with defendant. As vice-principal of an elementary school, she is a mandated reporter of child abuse. She saw no evidence of molestation in D's interactions with defendant.

D's grandmother denied seeing D doing anything sexually inappropriate with a male cousin, though she recalled that once they were playing in the bedroom with the door closed.

## C. JUROR DELIBERATIONS AND POSTTRIAL MOTIONS

The jury was instructed on Friday, July 30, 2010, after three days of testimony. Included was an instruction that the continuous sexual abuse charge in count 1 was an alternative charge to counts 2 through 16 and that defendant could not be found guilty of both count 1 and any of the other charges. And the prosecutor explained to the jury that of the five oral copulation charges (counts 6, 10, 11, 12, 14), four incidents—counts 7, 8, 9, and 13—were alternatively charged as lewd and lascivious touching "because oral copulation could be construed to be a lewd and lascivious act." In other words, for those four incidents, the jury could find that the defendant committed oral copulation or lewd

10

and lascivious conduct, but not both. Finally, the prosecutor explained that the proof of count 16 (aggravated sexual assault on a child) was that defendant committed count 15, the crime of foreign object penetration.

The jury retired to deliberate at 11:45 a.m. At 12:10 p.m., one juror ("Juror One") wrote a note to the judge saying that the defendant's son might have been a student of his a long time ago. After conferring with counsel, the judge wrote a note back saying it was not a cause for concern. At 1:30 p.m., the jury asked for and received a readback of what defendant said about D serving him coffee in bed. Deliberations ended for the day at 4:35 p.m. to resume on Monday.

Deliberations resumed at 9 a.m. on Monday, August 2, 2010. At 10:25 a.m., the jury wrote a note expressing confusion about which count was referenced in the part of the instructions relating to count 16. After conferring with counsel, the judge wrote a note explaining that this part of the instructions referenced count 15 (sexual penetration with a foreign object). At 10:48 a.m. the jury informed the bailiff they had reached their verdicts in which they found defendant guilty as charged, except for finding him not guilty of alternative count 1 (continuous sexual abuse), as well as counts 4 (lewd touching in the winter of 2001), 8 (lewd touching in the winter of 2003), and 11 (oral copulation in the winter of 2003).

After his conviction, defendant made two different motions for a new trial. The first motion alleged the omission of a unanimity instruction and the lack of evidence of force or duress to support the foreign object penetration convictions (counts 15 and 16). The second motion alleged juror misconduct in that two jurors had discussed the case during the prosecution's presentation of evidence and predetermined defendant's guilt before deliberations. The trial court denied both motions after hearings on each.

### 3. JUROR MISCONDUCT

Defendant raises two claims related to juror misconduct: (1) that two individual jurors committed serious misconduct in violation of his rights to a fair trial by an

impartial jury under the Sixth and Fourteenth Amendments, and (2) that the trial court violated his due process rights by precluding him from contacting one of the offending jurors. He contends both errors require reversal.

## A. STANDARD OF REVIEW

We accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence, but we independently review whether any misconduct was prejudicial. (*People v. Dykes* (2009) 46 Cal.4th 731, 809.)

A finding of misconduct raises a rebuttable presumption of prejudice. "As a general rule, juror misconduct 'raises a presumption of prejudice that may be rebutted by proof that no prejudice actually resulted.'" (*In re Hitchings* (1993) 6 Cal.4th 97, 118 (*Hitchings*).) "The defendant need not affirmatively prove the jury's deliberations were improperly affected by the misconduct, for that cannot be done under Evidence Code section 1150 . . . . Therefore, '"The presumption of prejudice is an evidentiary aid to those parties who are able to establish serious misconduct of a type likely to have had an effect on the verdict or which deprived the complaining party of thorough consideration of his case, yet who are unable to establish by a preponderance of the evidence that actual prejudice occurred. The law thus recognizes the substantial barrier to proof of prejudice which Evidence Code section 1150 erects, and it seeks to lower that barrier somewhat."'" (*In re Carpenter* (1995) 9 Cal.4th 634, 652, internal citation omitted (*Carpenter*).)

The presumption of prejudice is rebutted if the entire record, including the nature of the misconduct and the surrounding circumstances, shows there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant. (*People v. Davis* (2009) 46 Cal.4th 539, 625; *In re Hamilton* (1999) 20 Cal.4th 273, 296.)

As to the order precluding defendant from contacting a juror, we review the trial court's ruling for an abuse of discretion. (*People v. Jones* (1998) 17 Cal.4th 279, 317; *People v. Carrasco* (2008) 163 Cal.App.4th 978, 991; *People v. Santos* (2007) 147

12

Cal.App.4th 965, 978.)  Trial courts have broad discretion to allow, limit, or deny access to jurors' contact information.  (*Townsel v. Superior Court* (1999) 20 Cal.4th 1084, 1091; *People v. Tuggles* (2009) 178 Cal.App.4th 1106, 380.)

### B.  EVIDENCE CODE SECTION 1150

Evidence Code section 1150 restricts our consideration of certain evidence.[5]  We may not consider evidence of what the juror "felt" or how he understood the trial court's instructions.  (*People v. Sutter* (1982) 134 Cal.App.3d 806, 819)  "A juror is not allowed to say: 'I acknowledge grave misconduct.  I received evidence without the presence of the court.  But those matters had no influence upon my mind when casting my vote in the jury room.'  The law, in its wisdom, does not allow a juror to purge himself in that way." (*People v. Stokes* (1894) 103 Cal. 193, 197; *Carpenter*, *supra*, 9 Cal.4th 634, 651; *People v. Cooper* (1991) 53 Cal.3d 771, 835.)

Evidence Code section 1150 distinguishes between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can be neither corroborated nor disproved. (*People v. Steele* (2002) 27 Cal.4th 1230, 1261; *People v. Hutchinson* (1969) 71 Cal.2d 342, 349.)  The only influences that may be proved to impeach a verdict are those open to sight, hearing, and the other senses and thus subject to corroboration.  (*Id.* at p. 350.)  Even when the trial court receives inadmissible evidence without objection, we must limit our consideration to the overt acts reflected in the testimony. (*People v. Collins* (2010) 49 Cal.4th 175, 249.)

---

[5]  Evidence Code section 1150, subdivision (a), provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly.  No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

13

A juror's statement, however, is admissible under section 1150 when the very making of the statement constitutes misconduct. (*In re Stankewitz* (1985) 40 Cal.3d 391, 398; *People v. Cleveland* (2001) 25 Cal.4th 466, 484; *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 787.) "Such an act is as much an objective fact as a juror's reading of a novel during the taking of testimony [citation], or a juror's consultation with an outside attorney for advice on the law applicable to the case [citation]." (*In re Stankewitz, supra*, at p. 391.)

### C. THE EVIDENCE OF MISCONDUCT

### (1). The Statement from Eric D.

Two months after the jury rendered its verdict, defense counsel discovered evidence that two jurors had committed misconduct. An investigator for the defense interviewed Eric D., defendant's employer, who stated the following: An alternate juror's husband told him (Eric D.) that the alternate juror overheard two jurors discussing the case repeatedly during breaks. The alternate juror stated that, from the beginning, the two jurors said defendant was guilty. They made repeated comments such as, "Cut off his balls, Hang him high."

Based on Eric D.'s statement to the defense investigator, defendant petitioned the court to release the jurors' contact information under Code of Civil Procedure section 237. In support, defense counsel submitted a declaration attaching his investigator's unsworn statement summarizing her interview of Eric D.

The trial court held a hearing to determine, among other matters, whether to release the jurors' information to the defense. Prior to the hearing, the court sent jurors notice of the hearing and its purpose. The notice informed them that if they wished to oppose the release of their information, they could respond in person, in writing, by telephone, or through counsel. There is no evidence in the record that any juror opposed the petition to have their information released.

14

After the hearing, the court ordered disclosure of the alternate juror's information, but the court did not disclose contact information for any other jurors.

**(2). Defendant's Second Petition for Disclosure of Jurors' Information**

Defendant, citing Code of Civil Procedure sections 206 and 237, petitioned the court a second time to release all jurors' information. Defense counsel filed a declaration stating that his investigator had contacted the alternate juror, but the alternate juror and her husband had denied the allegations of misconduct. Defendant was also unable to contact any other jurors. And defendant requested that if the court denied his petition for release of the information that the court send letters to the jurors asking whether they would consent (or object) to disclosure of their contact information.

The court again sent jurors notice of a second hearing on defendant's renewed petition for disclosure. The notice included a form allowing jurors to record their consent or objection to disclosure. One juror ("Juror One") consented to disclosure. The record does not indicate whether any other jurors consented or objected to disclosure of their information, but it shows that some jurors did not respond in any fashion, and no jurors appeared in person to object.

At the hearing, the court set an evidentiary hearing for February 18, 2011. The defense agreed to subpoena the alternate juror, her husband, and Eric D. to appear at the hearing. The court also ruled that defendant could contact Juror One, but it ordered counsel not to contact any other jurors until after the evidentiary hearing.

On February 14, 2011, four days before the evidentiary hearing, defense counsel contacted Juror One. Juror One told defense counsel that he did not see anything suggesting jurors had made up their minds before deliberation, and he had not heard any comments such as "cut off his balls." Juror One said the jurors talked about everything *but* the case before deliberation. He expressed his opinion that defendant got a fair trial and said "the system worked."

15

### (3). The February 18, 2011 Evidentiary Hearing

The court held an evidentiary hearing on February 18, 2011. Three witnesses testified: Eric D., the alternate juror (Robin G.), and her husband (Sean G.). Eric D. testified that he was a liquor store owner who owned the store where defendant had worked. Eric D. said that about three weeks after the trial, a customer named "Sean" came into the store and said his wife was part of the jury. According to Eric D., Sean G. said his wife had witnessed other jurors discussing the case during breaks, saying that "they should cut off his balls and hang him."

Sean G. testified after Eric D. He admitted that he went to Eric D.'s liquor store after the trial and that he told Eric D. that his wife was an alternate juror. However, he denied telling Eric D. that his wife had witnessed jurors discussing the case or talking about cutting off defendant's balls.

Robin G., the alternate juror, testified last. She denied that she had seen any jurors discussing the case before deliberations. She also denied that she heard anyone talk about cutting off defendant's balls or hanging him, and she denied telling her husband anything to that effect.

The trial court made a factual finding that Eric D. was biased because he knew defendant's family. The court found there had been no juror misconduct, and it denied defendant's motion for a new trial.

### (4). Juror One's Disclosure of his Conversation with Juror Two

Ten days after the evidentiary hearing, on February 28, 2011, Juror One telephoned defense counsel. A defense attorney who joined the call submitted a sworn declaration memorializing the following statement: After a particularly emotional part of the prosecution's case, Juror One had a conversation with a fellow juror ("Juror Two"). Juror Two was a male in his 40s. Juror Two asked Juror One what he thought of the pending case. Juror One replied that he would find the defendant guilty if the trial were

16

to end that day.  *Juror One said he wanted to hear what the defense was going to present.*[6]  Juror One asked Juror Two if he thought they should report their conversation to the judge.  *They agreed that their conversation would not have an effect on their deliberations*, and they decided not to report the conversation.  Juror One could not recall if he said anything to the effect of "cut off his nuts."  He said that he might have said this, but he could not say whether he did or did not say those words.  Juror One stated that it took him "two nights of fitful sleep" to decide to talk to defense counsel about his actions, and he was concerned that doing so might open "Pandora's box."

The next day, on March 1, 2011, Juror One met with the prosecutor and her investigator to tell them about his discussion with defense counsel.  According to a statement by the investigator, Juror One told them the following:  Juror One did not want the prosecution to be "blind sighted [*sic*]" by his conversation with the defense.  When the defense first contacted him about an alleged conversation with another juror, Juror One denied all accusations and ended the conversation.  However, Juror One decided to call back defense counsel to inform him of a conversation Juror One had with Juror Two during a recess after the victim's mother testified.  While leaning over the second floor railing of the courthouse, Juror Two asked Juror One what he thought of the case.  Juror One told Juror Two that "If the trial were to end today I'd find him guilty."  Juror Two responded, "I would too."  They spoke in a low tone.  Juror One could not recall if he said something about "cutting off Villarreal's nuts" but would not preclude the possibility that he said it.  Juror One and defense counsel agreed to meet in person to discuss matters further, but Juror One changed his mind and called off the meeting.  Juror One told

---

[6] We use italics to identify all statements made inadmissible by Evidence Code section 1150, as the California Supreme Court did in *People v. Danks*, *supra*, 32 Cal.4th 269.  We explain our application of the statute to these statements in Section 3.E below.

defense counsel he was no longer willing to meet with the defense, and asked counsel not to contact him any further.

Based on Juror One's statements, defendant filed a renewed motion for a new trial. Defendant argued that, in the alternative, the court "should order an evidentiary hearing in order to obtain the sworn testimony of the sitting juror in question, and the other juror who participated in the conversation." The court held a hearing on March 25, 2011, to set a date for an evidentiary hearing and to hear further argument on defendant's motion for a new trial. At that hearing, the court set an evidentiary hearing for May 27, 2011, and ordered the prosecution to subpoena Juror One. The court again ordered defense counsel and his investigator not to talk to any jurors "Because it's not truly misconduct yet." The court said that if it found Juror One's statements credible, the court might require the other jurors to appear in court to testify on the record.

On April 20, 2011, Juror One wrote a letter to both defense counsel and the prosecutor, once more setting forth the details of his conduct. He stated that he had a brief conversation with another male juror during a recess in which he had "an emotional meltdown." He again stated that it was possible he had said defendant's nuts should be cut off, but he could not recall whether he actually said it. He wrote, "what I do remember is the emotion. I was stunned that [the victim] had never talked to a teacher, outraged that nobody had protected this child, and hostile towards Villarreal." He wrote that after his "embarrassing outburst, *I recoiled, recovered my composure, and said that I was looking forward to the defense.*" Juror Two "assured me that I had done no harm." Finally, he wrote, "*I resolved for the rest of the trial to be a conscientious and impartial juror who would follow the judge's instructions to the letter, and I believe that I did.*" He described his mindset during deliberations, and said he thought he was fair to defendant.

18

**(5).  The May 27, 2011 Evidentiary Hearing**

At the May 27, 2011 evidentiary hearing, Juror One testified to the following:  He heard the court admonish the jury at each break not to form or express any opinion about the case until it was submitted for deliberation, and not to have any discussions with any other jurors.[7]  His conversation with Juror Two occurred after the mother's testimony, which he described as "a very emotional part of the case."  Juror One "*had really been looking forward to hearing from*" D's mother, but he "*thought she was a lousy witness.  I mean, just a flaky mom.*"

At a break after the mother's testimony, Juror One was standing at a rail with Juror Two.  Juror One identified Juror Two as a Caucasian male in his 40s, about an inch taller than Juror One, who was a smoker like himself.  After "a long, uncomfortable pause," Juror Two asked him, " 'Well, what do you think?' "  Juror One testified that "what I should have said was, I don't think it's going to rain today, but instead my cork popped; I just blew up."

Juror One conceded it was possible he said, "I think we should cut his nuts off," but he could not confirm it.  Defense counsel questioned him further on this point:

"[Q.]  [Juror One], you mentioned it's possible that you may have said that you would cut the defendant's nuts off.

"[A.]  Well, I wouldn't, but somebody should.

"[Q.]  Somebody should.  The precise thing you said is that somebody should cut his nuts off?

---

[7] Pursuant to Penal Code section 1122, the trial court repeatedly admonished the jurors—before opening arguments, at each adjournment, and at the close of evidence—not to discuss the case with each other and not to form any opinions about the case before deliberations.

"[A.]  I don't know if I said that.  If I were to have said something like that, um, the word that I would have used was 'nuts.'

"[Q.]  Okay.  Do you think you said something like that, as you reflect back upon this now?

"[A.]  I honestly do not know the answer to that question."

On further questioning, Juror One testified that he remembered the emotion underlying the statement, and he agreed that the comment was derogatory or inflammatory in nature:

"[Q.]  When you were tossing and turning and thinking about this thing prior to calling me, were you concerned about what you had said?"

"[A.]  Absolutely.  I was trying to remember, and I couldn't.  What I remembered was the emotion.

"[Q.]  Okay. And what you also remember correct me if I'm wrong—is that you said something which was very inflammatory, but you can't precisely remember what you said.  Is that fair?

"[A.]  Yes, it is.  That's fair.  Whatever it is that I said about Mr. Villarreal at that particular moment would not have been nice.  I know that.

"[Q.]  Okay.  And so the precise language that you used is not something that you can now recall, but it was something very derogatory?

"[A.]  I should think so.  That's where my head was at the time.  I believe that."

Juror One did not recall that he or Juror Two said anything like, "They ought to hang him high."

Juror One testified that "after my cork popped," he told Juror Two, " '[i]f the trial were to end today, I'd find him guilty,' and Juror Two said, 'I would too.' *And at that point I realized this is a road that we can't go down.*  Okay.  And so—um, we've been enjoined not to discuss this or to form prior opinions, *and I felt like I'd blown it.*"

Juror One admitted he was not impartial towards defendant at the time, but he characterized it as a "very brief moment" that he regretted:

"[Q.] Okay. [Juror One], is it fair to say that in this emotional outburst or breakdown you felt hostile towards Mr. Villarreal?

"[A.] I did at the moment.

"[Q.] And you felt like you wanted to see him punished?

"[A.] At that moment I did.

"[Q.] And it's fair to say that at that point you were certainly not impartial, right?

"[A.] I was emotional.

"[Q.] And not impartial?

"[A.] I have to—I have to admit to that, yes.

"[Q.] And—

"[A.] *Also I'd like to say that that was a very brief moment, which I immediately regretted*."

Juror One testified that he and Juror Two agreed not to report the incident to the judge. "I asked [Juror 2], I said, 'Do you think we need to report this to the judge?' And [Juror 2] said to me, 'Is there anything I have said that would influence you as a juror?' and I said 'No.' And [Juror 2] said, '*Well there's nothing that you've said that would influence me either*, and I don't think we need to report this to the judge.'" Juror One testified that he did not disclose the conversation to the court "Because we thought we had handled it." Juror One admitted that he felt guilty about violating the court's order, and added that Juror Two "gave me permission—in a way, he gave me permission to be forgiven . . . ." Juror One described their exchange as "a quiet conversation, though, and brief." After this conversation, Juror One heard additional admonitions from the trial judge. He thought to himself, "*You know what, I can do this. You know, I can—I can wait until all of the testimony is in to decide how I'm going to vote*."

21

Juror One also testified that "*we were both looking forward to hearing what the defense was going to have to say*." "*I told [Juror Two] that I thought that the prosecution's case was compelling and that—I was looking forward to what the defense would say. And we thought that it would also be top-notch, and it turned out that it was.*"

During jury deliberations, Juror One did not volunteer to be the foreperson; a woman did. In discussing the charges, Juror One was the third juror to speak. In deliberations, the jurors reviewed each charge separately. Four people had taken notes, including Juror One. The jurors read the notes aloud. Juror One's notes were the best, so the foreperson had Juror One read his notes for every charge. There were no notes for some charges. The jury found defendant not guilty on some charges. The conversation with Juror Two was not mentioned during deliberations.

Over defense objection, Juror One testified *that he had not made up his mind when deliberations started. "I felt there might be reasonable doubt, and I was wondering if anybody else felt the same way. Nobody shared the same concern that I had." "I went into the juror room not knowing which way I would vote." "I felt that he was probably guilty but that that wasn't enough to convict. I wanted to hear what the other jurors had to say.*" Over defense objection, the prosecutor elicited Juror One's *impressions of the victim's credibility and the testimony of defendant's son and the son's wife*.

Juror One admitted that he misled defense counsel in their initial phone call when he told counsel that nothing untoward had occurred. The court questioned Juror One about why he decided to call back defense counsel to admit his conversation with Juror Two. Juror One testified, "I felt like he didn't understand what happened in the jury room, and I wanted to lay it out for him." He added that he "thought if I told both lawyers what happened, they would get together and talk about it and decide there was no issue, and that would be the end of it. But, of course, that's not what happened."

22

**(6). The Trial Court's Ruling**

After argument on the matter, the court announced its ruling orally:[8] "First of all, I listed the factors to be considered by the Court for the decision. In rereading *Hitchings*, it is distinguished from this case in that the juror lied on voir dire concealing knowledge about the case, and that was coupled with the violation of the Court's admonishment against talking in vitriolic language to a non-juror. That gave substantial evidence of prejudice and there was no substantial evidence of rebuttal to the issue of the prejudice.

"In this case [Juror One]'s outburst came after the victim's mother's testimony. [Juror One] said he was very emotional at the time. *He felt that the D.A. had presented a compelling and top-notch case and he wondered if the defense would do the same, and he said, 'and they did.'*

"[Juror One] recognized his violation of the Court's admonishment, and he said *he couldn't go down that road. He felt that the other juror thought so, too.* His self-admonishment does not cure the outburst. The court has to review the totality of the case to determine if [Juror One] was, in fact, a biased juror in the deliberation process.

"[Juror One] stated that in the jury room he did not volunteer to be the foreperson, and he did not state his prior position. *He wanted to see what the other jurors had to say.*

"The jury's verdicts found that the defendant was not guilty on four of his sixteen counts. The Court can draw an inference that the jury deliberated on each count as charged.

"That the outburst occurred before the defense presented their case *and [Juror One] was open to hearing what the evidence the defense would present* is a factor to be

---

[8] As we did with Juror One's letter and testimony, we italicize those portions of the trial court's ruling that rely on testimony made inadmissible by Evidence Code section 1150.

considered by the Court. Further, there is no evidence that [Juror One] lied on voir dire in this case.

"In an emotional case, such as this, one reacts emotionally as the case proceeds. And their emotions will vary from juror to juror during the trial.

"We can't ask for a perfect trial or a perfect system, but we can require a fair trial. [Juror One] said he was overheard by another juror when they had gone to an area to smoke on a break. *He then recognized his error and didn't want to go down that road and he felt the other juror understood that.*

"There is insufficient evidence to find that [Juror One] is a biased juror and there is substantial evidence to rebut the prejudicial remarks made by [Juror One].

"The motion for new trial is denied."

**(7). Factual Findings**

We acknowledge that we must accept the trial court's factual findings and credibility determinations if they are supported by substantial evidence. (*People v. Dykes* (2009) 46 Cal.4th 731, 809.) But we note that the trial court did not explicitly detail its factual findings. Furthermore, we are unable to rely on any findings that are based on evidence that is excluded by Evidence Code section 1150.

The court initially discredited the testimony of Eric D., finding no misconduct. While the court never reconsidered this finding, it implicitly credited Juror One's testimony, which substantially corroborated Eric D.'s testimony. Regardless, Juror One and Juror Two discussed the case with each other after the mother's testimony, before the prosecution rested. At the time of their conversation, both Juror One and Juror Two had formed the opinion that defendant was guilty.

The court found that Juror One experienced an emotional outburst, but it made no finding on whether Juror One said that defendant should be castrated. Nonetheless, Juror One admitted that he harbored a bias against defendant at the time of his discussion with

24

Juror Two. He also testified that he recalled the emotion of making a derogatory and inflammatory statement about defendant, admitting to his lack of impartiality. Furthermore, Juror One and Juror Two agreed not to disclose their conversation to the trial court. Juror One continued to keep the conversation secret until ten days after the first evidentiary hearing on February 18, 2011. And in a phone call with defense counsel four days before the hearing, he falsely denied that any misconduct had occurred.

The trial court made essentially no factual findings regarding Juror Two. The court found only that Juror One, recognizing his violation of the court's admonishment, said "*[Juror One] couldn't go down that road*," and that "*[Juror One] felt that [Juror Two] thought so, too*."[9] The record contains no evidence to support this finding as to Juror Two.[10]

## D. THE EXISTENCE OF MISCONDUCT

Respondent concedes that Juror One and Juror Two engaged in misconduct. Nonetheless, we will examine the nature of the misconduct and consider whether the trial court's factual finding that the presumption of prejudice had been rebutted is supported by substantial evidence.

**(1). Legal Standard**

Under Penal Code section 1122, jurors must not "converse among themselves or with anyone else on any subject connected with the trial, or to form or express any opinion thereon until the cause is finally submitted to them." The admonition against

---

[9] Similarly, the court found that Juror One "recognized his error and didn't want to go down that road and he felt the other juror understood that."

[10] Juror One testified that he and Juror Two agreed that each of them were not influenced by the others' statements, and that they agreed not to disclose the conversation to the judge. Juror One testified that they agreed not to disclose the conversation because "We didn't think it was significant at the time," and "We just didn't think it was important." Juror One also testified that "We thought we handled it."

25

forming an opinion requires jurors to consider all the evidence and precludes jurors from ignoring "further evidence, argument, instructions, or the views of other jurors." (*People v. Allen* (2011) 53 Cal.4th 60, 73; cf. *Hitchings*, *supra*, 6 Cal.4th 97, 120-121; *People v. Wilson* (2008) 44 Cal.4th 758, 840.) The admonition against discussing the case protects jurors from extraneous influence outside of the evidence and instructions. (*Carpenter*, *supra*, 9 Cal.4th 634, 676; *People v. Loker* (2008) 44 Cal.4th 691, 755.) "Violation of this duty is serious misconduct." (*Hitchings*, *supra*, 6 Cal.4th at p. 118.) "Because a defendant charged with crime has a right to the unanimous verdict of 12 impartial jurors [citation], it is settled that a conviction cannot stand if even a single juror has been improperly influenced." (*People v. Pierce* (1979) 24 Cal.3d 199, 208; see *People v. Nesler* (1997) 16 Cal.4th 561, 578.)

**(2). Misconduct by Juror One**

We first consider whether substantial evidence establishes misconduct by Juror One. We conclude that it does.

During the prosecution's case, Juror One discussed the case with Juror Two and stated that "[i]f the trial were to end today, I'd find him guilty."[11] Juror One also made an inflammatory and derogatory remark about defendant. By making these statements, Juror One violated the court's admonishment against discussing the case with another juror as well as the admonishment against forming opinions about the case. Violation of these duties constitutes serious misconduct. (*Hitchings*, *supra*, 6 Cal.4th at p. 118; *People v. Brown* (1976) 61 Cal.App.3d 476, 480.) "When a person violates his oath as a juror, doubt is cast on that person's ability to otherwise perform his duties." (*People v. Cooper*

---

[11] This evidence is admissible under Evidence Code 1150 since the very making of these statements constitutes misconduct. (*In re Stankewitz, supra,* 40 Cal.3d 391, 398; *People v. Cleveland, supra,* 25 Cal.4th 466, 484; *Grobeson v. City of Los Angeles, supra,* 190 Cal.App.4th 778, 787.)

(1991) 53 Cal.3d 771, 835-836; *People v. Cissna* (2010) 182 Cal.App.4th 1105, 1118 [A juror's failure to comply with repeated admonitions not to discuss the case casts serious doubts on his willingness to follow the court's other instructions].) Juror One's derogatory and inflammatory statement about defendant underscores the seriousness of the misconduct. (See *Hitchings*, *supra*, 6 Cal.4th at p. 117 [juror stated that defendant should be castrated, inter alia].)

Juror One exacerbated the misconduct in three ways. First, he exposed Juror Two to his prejudicial opinion. This may have influenced Juror Two's opinions or reinforced Juror Two's own prematurely formed opinions. Second, Juror One agreed with Juror Two not to disclose the conversation to the court. (See *People v. Nesler*, *supra*, 16 Cal.4th 561, 580 [failure to disclose misconduct to the court, together with use of outside information during deliberations, are adequate to establish serious misconduct].) This precluded the court from admonishing the two jurors further or removing them altogether. It also precluded defendant from seeking curative measures. Third, four days before the first evidentiary hearing on February 18, 2011, Juror One misled defense counsel about the conversation he had with Juror Two. Had Juror One instead chosen to testify truthfully at the first hearing, he would have corroborated Eric D. while impeaching the alternate juror and her husband. Defense counsel and the court could have examined those witnesses more effectively had the full extent of the misconduct been uncovered at that hearing. Juror One's conduct thereby impeded defendant's investigation and likely damaged his ability to challenge the verdict.

We conclude that Juror One's conversation with Juror Two, his premature opinion on defendant's guilt, his inflammatory and derogatory statement about defendant, and his role in concealing those violations constituted serious misconduct.

27

**(3). Misconduct by Juror Two**

We next consider whether substantial evidence establishes misconduct by Juror Two. We conclude that it does.

Juror Two initiated the pre-deliberation conversation with Juror One. When Juror One said that he would find defendant guilty, Juror Two responded, "I would too."[12] By making this statement, Juror Two violated the court's admonishment against discussing the case with another juror as well as the admonishment against forming opinions about the case. Violation of these duties constitutes serious misconduct. (*Hitchings*, *supra*, 6 Cal.4th at p. 118.)

Juror Two also exacerbated the misconduct. After the initial exchange, Juror One asked Juror Two if he thought they should report the conversation to the judge. Juror Two said he did not think so. Accordingly, neither juror reported the conversation to the judge. (See *People v. Nesler*, *supra*, 16 Cal.4th at p. 580 [failure to disclose misconduct to the court, together with use of outside information during deliberations, are adequate to establish serious misconduct].) Furthermore, the conversation was "quiet" and they spoke in "low tones," suggesting that both jurors knew it was improper.

Juror One admitted feeling guilty about violating the court's orders, but he testified that Juror Two's statements "gave me permission to be forgiven." Juror Two's statement thereby encouraged Juror One not to disclose the conversation. As explained above, by hiding the conversation, the two jurors prevented the court and defense counsel from addressing or curing the misconduct. We further note that, unlike Juror One, Juror Two never came forward to admit the misconduct.

---

[12] Again, these statements are admissible under Evidence Code section 1150 since the statements themselves constitute misconduct.

28

We conclude that Juror Two's conversation with Juror One, his premature opinion on defendant's guilt, and his role in concealing these violations constituted serious misconduct.

### E. REVERSAL IS REQUIRED DUE TO JUROR MISCONDUCT

Defendant argues the existence of juror misconduct requires reversal of the conviction because (1) the prosecution failed to rebut the presumption of prejudice and (2) the trial court erred in prohibiting defense counsel from contacting Juror Two. We agree.

### (1). Failure to Rebut the Presumption of Prejudice

Our finding of serious misconduct by Juror One and Juror Two raises a presumption of prejudice. Respondent contends the evidence is sufficient to rebut the presumption of prejudice. First, respondent lists several ways in which the jurors did *not* commit misconduct: There was no evidence that either juror lied on voir dire.[13] Neither juror received outside or extraneous information. Neither juror discussed the case with any non-jurors. These contentions are accurate, but the simple fact that the jurors did not engage in additional forms of misconduct proves little. Forming and expressing an opinion on a defendant's guilt prior to deliberations may be sufficient grounds for reversal without additional misconduct. (See *People v. Brown*, *supra*, 61 Cal.App.3d at p. 480 [reversal required where juror, during prosecution's case, expressed view that defendant was guilty].)

Respondent argues, without citation, that both jurors stated they were interested in hearing the defense case. Respondent adds, again without citation, that "the statement by [Juror One] and the second juror reflected that they had not conclusively prejudged the

---

[13] Voir dire of the jurors is not part of the normal record in a criminal appeal and is not included in the reporter's transcript here. (Cal. Rules of Court, rule 8.320(c)(3).)

case, that their minds remained open to the defense case, and that they both were going to consider further evidence and argument."

The record is ambiguous as to what Juror Two said about the defense case. The defense investigator's sworn declaration concerning the defense's initial conversation with Juror One states that he said "*he* wanted to hear what the defense was going to present." (Italics added.) Juror One said nothing about Juror Two making such a statement. Similarly, Juror One's April 20, 2011 letter states that he said "[*I*] was looking forward to the defense argument, and the other juror assured me that I had done no harm." (Italics added.) At the subsequent evidentiary hearing, Juror One then testified that "*we* were both looking forward to hearing what the defense was going to say." (Italics added.) He then immediately added, "Um, I told him that I thought that the prosecution's case was compelling and that—and *I* was looking forward to what the defense would say. And we thought that it would also be top-notch, and it turned out that it was." (Italics added.)

More critically, respondent fails to address the admissibility of these statements under Evidence Code section 1150. Juror One's statements to the effect that he and Juror Two were "looking forward" to the defense case are inadmissible under Evidence Code section 1150. The statements concern the jurors' mental processes, and respondent offers them to prove—or in this case, disprove—the effect of the misconduct on their deliberations. The language of the statute explicitly prohibits the admission of such evidence. (Evid. Code § 1150, subd. (a).) Whether a juror was "looking forward" to the defense is not an overt act; it is a purely subjective claim "which can be neither corroborated nor disproved. . . ." (*People v. Steele*, *supra*, 27 Cal.4th at p. 1261.)

The trial court also relied on Juror One's various descriptions of his state of mind and statements of impartiality. The court found that Juror One wondered if the defense would present a "top notch" case, and he said that they did. The court noted that Juror One, recognizing his violations, decided that he "couldn't go down that road." The court

30

also found that Juror One wanted to see what the other jurors had to say and that he was open to hearing the defense evidence. These are all statements of a juror's opinion and his subjective state of mind, and are inadmissible under Evidence Code section 1150. (*People v. Steele*, *supra*, 27 Cal.4th at p. 1261; *Grobeson v. City of Los Angeles*, *supra*, 190 Cal.App.4th at p. 793.) The statute "does not allow a juror to purge himself in that way." (*People v. Stokes*, *supra*, 103 Cal. at p. 197.)

At the evidentiary hearing, the trial court admitted many of these statements over defense counsel's objection or without consideration for Evidence Code section 1150. On appeal, we must apply the statute and consider only the overt acts reflected in the jurors' statements. (*People v. Collins*, *supra*, 49 Cal.4th at p. 250.)

Respondent, noting the jury's acquittal on four of the sixteen counts, contends the jury deliberated fairly on each count as charged.[14] The acquittal on Count One is irrelevant since the court instructed the jury it could not convict defendant on Count One if it convicted him on any of the other counts.[15] As to the other three acquittals, respondent's argument is speculative. (See *People v. Brown*, *supra*, 61 Cal.App.3d at p. 482.) In *Brown*, on facts similar to those here, the court reversed a conviction based on misconduct by a juror who stated during the prosecution's case that the defendant was guilty. The court rejected the argument that the offending juror's votes to acquit on eight charges showed he was impartial. Describing the argument as "pure speculation," the court declined to consider what negotiations, reasons, or motivations may have led the

---

[14] The jury began deliberating on Friday, July 30, 2010 at 11:45 a.m., and broke for lunch at 12:23 p.m. The jury returned at 1:30 p.m. and recessed at 4:35 p.m. The jury reconvened on Monday, August 2, 2010 at 9:00 a.m., and reached a verdict at 10:48 a.m. The record thereby shows that the jury deliberated for a total of five hours and 31 minutes.

[15] Respondent attaches significance to the jury's acquittal on Count One as "the most serious" charge. Of course, the court never instructed the jury as to which count was "most serious" or what the penalties were for a conviction on any charge.

31

offending juror to vote as he did. (*Ibid.*) The same reasoning applies here. The record contains no admissible evidence showing why either Juror One or Juror Two voted to acquit defendant on three counts while convicting him on twelve others.

Respondent also notes that, during deliberations, Juror One sent a note to the judge that defendant's son might have been a student of his. This evidence is modest, as far as it goes, and it says nothing whatsoever about Juror Two's degree of impartiality.

Respondent argues that we should find the presumption rebutted under *People v. Allen*, *supra*, 53 Cal.4th 60. *Allen* concerned a trial court's removal of a juror during deliberations. While deliberating, a juror said, "When the prosecution rested, she didn't have a case." (*Id.* at p. 70.) Two other jurors accused the juror of prejudging the case and reported the statement to the judge. The trial court questioned all the jurors, and the juror in question denied that he had made his mind up about the case before deliberations.[16] The California Supreme Court rejected the trial court's finding that the juror had prejudged the case. (*Id.* at p. 74-75.) The court noted, " 'it would be entirely unrealistic to expect jurors not to *think* about the case during the trial. . . .' [citation]" (*Id.* at p. 73.) (Italics added.)

The misconduct here consists not only of *thinking* about the case, but making statements about the case to another juror "while evidence was still being presented." (*People v. Allen*, *supra*, 53 Cal.4th 60, 73.) In *Allen*, the court made this distinction by comparing the facts of *Allen* to those in *Grobeson v. City of Los Angeles*, *supra*, 190 Cal.App.4th 778. (*Allen*, *supra*, 53 Cal.4th at p. 73.) In *Grobeson*, the court affirmed a grant of a new trial based on evidence that, in the middle of the trial, one juror told another, "I made up my mind already. I'm not going to listen to the rest of the stupid

---

[16] Evidence Code 1150 does not apply to evidence received while the jury is still deliberating; it applies only to postverdict challenges. (*People v. Allen*, *supra*, 53 Cal.4th 60, 72, fn. 10; *People v. Cleveland*, *supra*, 25 Cal.4th at p. 485.)

argument." (*Grobeson*, *supra*, 190 Cal.App.4th at p. 784.) The *Allen* court, describing the facts of its case, held, "This case is different. [The offending juror's] statement was made during deliberations. . . ."

The facts here more closely resemble those in *Grobeson*. Both Juror One and Juror Two made their statements before the prosecution had rested, not during deliberations. In doing so, they each exposed the other to their prejudgments, exacerbating the effect of the misconduct. The content of their statements conclusively established their pre-deliberation opinions of defendant. Unlike the court in *Allen*, under Evidence Code section 1150 we may not consider Juror One's subsequent statements to the contrary. (*Grobeson v. City of Los Angeles*, *supra*, 190 Cal.App.4th at p. 793 [Evidence Code section 1150 precluded admission of offending juror's statement that she did not form her opinion until deliberations, after the case was submitted to the jury].)

The misconduct here is even greater than the misconduct in *Grobeson* and *People v. Brown*, *supra*, 61 Cal.App.3d 476. The evidence shows that not one, but *two* jurors formed opinions on defendant's guilt during the prosecution's case. Juror One made an inflammatory and derogatory statement regarding defendant, underscoring the degree of his bias, and he later admitted that he was not impartial when he made that statement. And all of this occurred before the defense had an opportunity to present its case.

In deliberations, the jury relied on Juror One's notes. If his notes were biased, other jurors' opinions may have been infected through reliance on them. Furthermore, both jurors agreed not to disclose the conversation to the court. Juror One continued to keep the conversation secret post-trial; he did not disclose it until ten days after the first evidentiary hearing, before which he misled defense counsel about his misconduct. Juror Two never came forward at all, despite the court's two notices of evidentiary hearings. On these facts, the evidence of bias is substantial.

In rebuttal, respondent identifies only two objective facts: the votes for acquittal, and Juror One's note to the judge regarding defendant's son. Respondent's reliance on

33

Juror One's subjective statement of impartiality is precluded by Evidence Code section 1150, and respondent points to no evidence, other than his votes for acquittal on three out of fifteen counts, that Juror Two ever abandoned or put aside his prejudgment.

Taking the record as a whole, the evidence clearly establishes a reasonable probability of prejudice and a substantial likelihood that two jurors were actually biased against the defendant. We therefore conclude that the presumption of prejudice is not rebutted.

**(2). The Trial Court's Order Precluding Defendant From Contacting Juror Two**

Defendant argues that the trial court violated his due process rights by precluding him from contacting Juror Two. Defendant contends the court erred twice in refusing to unseal jurors' identities and contact information: First, when defense counsel came forward with the statement from Eric D., and again after Juror One admitted misconduct.

Code of Civil Procedure sections 206 and 237 govern the disclosure of juror information in a criminal trial. Code of Civil Procedure section 237 requires trial courts to seal jurors' names, addresses, and telephone numbers. (Code Civ. Proc., § 237, subd. (a)(2).) Code of Civil Procedure section 206 requires the court to inform jurors in a criminal action, prior to discharging them, "that they have an absolute right to discuss or not to discuss the deliberation or verdict with anyone." (Code Civ. Proc., § 207, subd. (a).) Once jurors are discharged, the parties may discuss the deliberations or the verdict with a juror, provided the juror consents to the discussion, and the discussion takes place at a reasonable time and place. (Code Civ. Proc., § 207, subd. (b).) A defendant may petition the court for access to information indentifying jurors, including their names, addresses, and telephone numbers. (Code Civ. Proc., § 207, subd. (g).)

Code of Civil Procedure section 237 sets forth the procedure for such a petition. "The petition shall be supported by a declaration that includes facts sufficient to establish good cause for the release. . . ." (Code Civ. Proc., § 237, subd. (b).) "Good cause" is a showing sufficient "to support a reasonable belief that jury misconduct occurred, that

34

diligent efforts were made to contact the jurors through other means, and that further investigation is necessary to provide the court with adequate information to rule on a motion for new trial." (*People v. Rhodes* (1989) 212 Cal.App.3d 541, 552.)[17]

If a defendant makes a prima facie showing of good cause, the court must set the matter for hearing. (Code Civ. Proc., § 237, subd. (b).) But the court must not set the matter for hearing if there is "a showing on the record of facts that establish a compelling interest against disclosure." (*Ibid.*) This includes, but is not limited to, protecting jurors from threats or danger of physical harm. (*Ibid.*) If the court does not set the matter for hearing, it must make express findings and set forth the reasons for not doing so. (*Ibid.*) If it sets a hearing, the court must provide notice to the former jurors. (Code Civ. Proc., § 237, subd. (c).) "Any affected former juror may appear in person, in writing, by telephone, or by counsel to protest the granting of the petition." (*Ibid.*)

"After the hearing, the records shall be made available as requested in the petition, unless a former juror's protest to the granting of the petition is sustained. The court shall sustain the protest of the former juror if, in the discretion of the court, the petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure as defined in subdivision (b), or the juror is unwilling to be contacted by the petitioner. The court shall set forth reasons and make express findings to support the granting or denying of the petition to disclose." (Code Civ. Proc., § 237, subd. (d).)

Defendant here first petitioned the court for disclosure of juror information after Eric D. came forward. Defendant filed a declaration by defense counsel with an unsworn statement from his investigator summarizing her interview of Eric D. After a hearing, the

---

[17] Although the Legislature amended Code of Civil Procedure sections 206 and 237 after *Rhodes* was decided, courts continue to apply this test. (*People v. Carrasco, supra,* 163 Cal.App.4th 978, 990.)

35

court disclosed the alternate juror's information, but did not disclose any other jurors' information.

At this point in the proceedings, defendant's sole evidence of misconduct consisted of a lone individual's statement containing several levels of hearsay. The statement listed none of the names of the persons involved, and the details of the alleged misconduct were vague. The facts here resemble those in *People v. Jefflo* (1998) 63 Cal.App.4th 1314 [statement by defendant's girlfriend that a juror told her the jury had hung was not a showing of good cause sufficient to warrant a hearing]. Nonetheless, the trial court held a hearing and released the alternate juror's information. The court did not abuse its discretion by refusing to release all of the jurors' information at that time.

But defendant then petitioned the court for disclosure a second time after his investigator contacted the alternate juror and her husband, who denied the allegations of misconduct. At this stage, defendant's showing of good cause was no stronger than his initial showing. Nonetheless, the court set a date for an evidentiary hearing, and sent jurors a second notice allowing them to object or consent to disclosure. Juror One consented to disclosure, and the court ruled that defendant could contact him. The record appears to show that the court released to defendant contact information for some jurors who did not respond to the court's notice, but the record does not show whether Juror Two's information was included in that release. It also appears that defense counsel's investigator had begun to contact some of the jurors, but the court then ordered defense counsel not to contact any other jurors besides Juror One. The court based its ruling on a finding that defendant had not yet made a prima facie showing of misconduct. Again, at this stage in the proceedings, defendant's evidence of juror misconduct was no stronger than his initial showing. Thus, the trial court did not abuse its discretion by declining to release all of the jurors' information at this point in time either.

At the February 18, 2011 evidentiary hearing, the alternate juror and her husband denied Eric D.'s allegations, and the court found no misconduct. Ten days after the

36

hearing, Juror One disclosed his conversation with Juror Two to both defense counsel and the prosecutor. This prompted defendant to renew his motion for a new trial wherein he asked the court for an evidentiary hearing to obtain the testimony of Juror One and Juror Two (who was apparently never identified.)

The court set an evidentiary hearing for May 27, 2011, and ordered the prosecution to subpoena Juror One. However, the court again ordered defense counsel and his investigator not to talk to any other jurors "Because it's not truly misconduct yet." The court said that if it found Juror One's statements credible, the court might require the other jurors to appear in court to testify on the record.

Despite Juror One's testimony at the May 27, 2011 evidentiary hearing, the court did not order any further evidentiary hearings or subpoena any other jurors to appear. The record shows no indication that the court lifted its order prohibiting the defense from contacting any other jurors. The record also shows no evidence that any jurors objected to disclosure of their information at any point during the proceedings.

After Juror One came forward, defendant had substantially good cause for the disclosure of other jurors' information, particularly Juror Two. Juror One had made numerous statements establishing "a reasonable belief that jury misconduct occurred," and specifically established that Juror Two had committed misconduct in at least two ways. Because Juror Two had not come forward, further investigation was warranted. Declarations from defense counsel and his investigator show that they made efforts to contact the jurors, but the court ordered them not to contact any jurors besides Juror One, prohibiting them from making any further "diligent efforts." As noted earlier, *People v. Rhodes* requires the disclosure of juror information unless a petitioner fails to show good cause, the record establishes the presence of a compelling interest against disclosure, or a juror is unwilling to be contacted by the petitioner. The record does not indicate that any of these circumstances existed; thus, the trial court abused its discretion by preventing defendant from contacting Juror Two.

37

Because the presumption of prejudice that arose from juror misconduct was not rebutted, and because the defendant was prevented from contacting Juror Two, his convictions must be reversed.

## 4. COUNTS 15 AND 16

Three of defendant's arguments on appeal target his convictions on count 15, forcible penetration with a foreign object in violation of section 289, subdivision (a), and count 16, aggravated sexual assault on a child in violation of section 269, subdivision (a)(5) where the "aggravated sexual assault" is defendant's violation of section 289, subdivision (a)—i.e., count 15. He contends: (A) he cannot be convicted of both counts, as count 15 is a lesser included offense of count 16; (B) there was insufficient evidence of the force or duress required by section 289, subdivision (a); and (C) the trial court erred in failing to instruct the jury about lesser included nonforcible offenses.

Despite our reversal of the judgment on other grounds, we must address whether there was sufficient evidence to support defendant's conviction of count 16. We will also reach certain related issues for the guidance of further proceedings.

### A. COUNT 15 IS A LESSER INCLUDED OFFENSE OF COUNT 16

Defendant contends he cannot stand convicted of both aggravated sexual assault on a child under section 269, subdivision (a)(5) and the lesser included offense of forcible sexual penetration under section 289, subdivision (a)(1). We agree.

The jury verdicts found defendant guilty of violating "section 289, subdivision (a)(1) as charged in count 15 of the information" and "section 269, subdivision (a)(5) as charged in count 16 of the information." The jurors were not actually given the information, but they were given a written instruction identifying the fall of 2005 as when counts 15 and 16 were alleged to have occurred.

In 2005, there was one way to violate section 269, subdivision (a)(5): "(a) Any person who commits any of the following acts upon a child who is under 14 years of age and 10 or more years younger than the person is guilty of aggravated sexual assault of a

38

child: [¶] . . . [¶] (5) A violation of subdivision (a) of Section 289." (Stats. 1st Ex. Sess. 1993-1994, ch. 48, § 1, p. 8761.)[18] This statute has subsequently been amended and expanded twice, once by initiative. One relevant change is that the age difference has been reduced to seven or more years from 10. (Stats. 2006, ch. 337, § 6, p. 2589.)

In 2005, there were two ways to violate section 289, subdivision (a) that was charged as count 15: "(1) Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person shall be punished by imprisonment in the state prison for three, six, or eight years. [¶] (2) Any person who commits an act of sexual penetration when the act is accomplished against the victim's will by threatening to retaliate in the future against the victim or any other person, and there is a reasonable possibility that the perpetrator will execute the threat, shall be punished by imprisonment in the state prison for three, six, or eight years." (Stats. 2002, ch. 302, § 5, p. 1207.) This statute has subsequently been amended and expanded. (Stats. 2010, ch. 219, § 9.)

*People v. Milward* (2011) 52 Cal.4th 580, 585, explained: "Generally, there is no limit to the number of convictions arising from a defendant's act or course of conduct. (§ 954.) But an exception exists for lesser included offenses. '[I]f a crime cannot be

---

**18** The full version of section 269, subdivision (a) in effect in 2005 provided: "(a) Any person who commits any of the following acts upon a child who is under 14 years of age and 10 or more years younger than the person is guilty of aggravated sexual assault of a child: [¶] (1) A violation of paragraph (2) of subdivision (a) of Section 261. [¶] (2) A violation of Section 264.1. [¶] (3) Sodomy, in violation of Section 286, when committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. [¶] (4) Oral copulation, in violation of Section 288a, when committed by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person. [¶] (5) A violation of subdivision (a) of Section 289." (Stats. 1st Ex. Sess. 1993-1994, ch. 48, § 1, p. 8761.)

39

committed without also necessarily committing a lesser offense, the latter is a lesser included offense within the former.'  (*People v. Lopez* (1998) 19 Cal.4th 282, 288.)  In such cases, a defendant may not be convicted of both the greater and the lesser offense. (*People v. Reed* (2006) 38 Cal.4th 1224, 1227.)"

The California Supreme Court has "applied two tests in determining whether an uncharged offense is necessarily included within a charged offense:  the 'elements' test and the 'accusatory pleading' test.  Under the elements test, if the statutory elements of the greater offense include all of the statutory elements of the lesser offense, the latter is necessarily included in the former.  Under the accusatory pleading test, if the facts actually alleged in the accusatory pleading include all of the elements of the lesser offense, the latter is necessarily included in the former.  (*People v. Lopez, supra,* 19 Cal.4th at pp. 288-289.)"  (*People v. Reed*, *supra*, 38 Cal.4th 1224, 1227-1228 (*Reed*).) *Reed* held that the accusatory pleading test is inapplicable to multiple convictions of charged offenses.  "In deciding whether multiple conviction is proper, a court should consider only the statutory elements.  Or, as formulated in *Scheidt,* 'only a statutorily lesser included offense is subject to the bar against multiple convictions in the same proceeding.  An offense that may be a lesser included offense because of the specific nature of the accusatory pleading is not subject to the same bar.'"  (*Reed*, *supra*, 38 Cal.4th at p. 1229, quoting *People v. Scheidt* (1991) 231 Cal.App.3d 162, 165-166.)

The Attorney General argues that, because there are a number of different ways to violate section 269, a violation of section 289 is "not necessarily included within section 269."  That is literally true, but count 16 charged defendant with violating section 269, *subdivision (a)(5)*, which specifically references a violation of section 289.  In other words, a violation of section 289, subdivision (a) is by statute an element of violating section 269, subdivision (a)(5).

A similar argument was rejected by *People v. Binkerd* (2007) 155 Cal.App.4th 1143 (*Binkerd*).  In that case, the defendant contended that she could not be convicted of

40

both vehicular manslaughter in violation of former section 192, subdivision (c)(3) and driving under the influence causing injury in violation of Vehicle Code section 23153, subdivision (a). At the time of her offense "section 192 subdivision (c)(3) defined vehicular manslaughter as '[d]riving a vehicle in violation of Section 23140, 23152, or 23153 of the Vehicle Code and in the commission of an unlawful act, not amounting to a felony, but without gross negligence; or driving a vehicle in violation of Section 23140, 23152, or 23153 of the Vehicle Code and in the commission of a lawful act which might produce death, in an unlawful manner, but without gross negligence.'" (*Id.* at p. 1147.)

The Attorney General argued in *Binkerd* that because section 192, subdivision (c)(3) could have been violated in ways other than violating Vehicle Code section 23153, a violation of the latter statute was not a necessarily included offense. But the appellate court noted that the vehicular manslaughter statute was written in the disjunctive and did not require proof that all three Vehicle Code sections had been violated. "[A]ccepting the People's argument would mean that there could never be a lesser included offense of section 192, subdivision (c)(3). This is incorrect." (*Binkerd*, *supra*, 155 Cal.App.4th 1143, 1149.)

Though the trial court did stay the punishment on count 15 in favor of the punishment on count 16, we conclude that, in this case, the offense of sexual penetration with a foreign object under section 289, subdivision (a) was a lesser included offense of a violation of section 269, subdivision (a)(5), and defendant cannot be convicted of both counts.

## B. SUFFICIENCY OF THE EVIDENCE FOR COUNTS 15 AND 16

Defendant also contends that there was insufficient evidence to support the verdicts finding him guilty of violating "section 289, subdivision (a)(1) as charged in count 15 of the information" and "section 269, subdivision (a)(5) as charged in count 16 of the information." He restates the contention made in his prior motion for a new trial that there was insufficient evidence of either force or duress. If defendant were correct,

41

he could not be retried on courts 15 and 16.  We conclude, however, that there is sufficient evidence to support these convictions.  Therefore, retrial on these charges is not barred.

The prosecutor argued to the jury that defendant used his finger to sexually penetrate D in the fall of 2005.  As to "force, violence, duress, menace or fear," "the People would argue . . . the force aspect, because [D] testified that he, as you may recall, had got even more aggressive and tore the belt loop to her pants and inserted his finger into her vagina."

One ground of defendant's motion for a new trial was that there was insufficient evidence of force or duress.  In opposing the motion, the People argued that there was substantial evidence of duress.  At a hearing on February 18, 2011, the court refused defendant's request to strike the force finding, stating that no threat or implied threat was required to establish duress.  "The age difference and the relationship constitute the duress that equals the force necessary for that section."

In reviewing defendant's challenge to the sufficiency of the evidence to support his conviction, "we must determine only whether, on the record as a whole, any rational trier of fact could find him guilty beyond a reasonable doubt.  [Citation.]  We view the evidence in the light most favorable to the prosecution, and presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence."  (*In re Asencio* (2008) 166 Cal.App.4th 1195, 1205.)

As the crime of sexual penetration may be based alternatively on force or duress, we will focus on the evidence of duress.

In reviewing the record for evidence of "duress," it is important to keep in mind the applicable definition of "duress," as California courts now recognize at least three established definitions of "duress" involved in sex crimes.  "Duress" has had one case law definition since 1985 for sex crimes other than rape.  As *People v. Leal* (2004) 33 Cal.4th 999, 1004-1005, explained:  "The term 'duress' as used in section 288,

42

subdivision (b)(1), was first defined in *People v. Pitmon* [(1985)] 170 Cal.App.3d 38, 48 [*Pitmon*]. The Court of Appeal in *Pitmon* observed: 'Duress, as an element of a criminal offense has not been previously given legal definition.' (*Id.* at p. 48.) . . . The court in *Pitmon* . . . found 'duress as used in the context of section 288 to mean a direct or implied threat of force, violence, danger, *hardship* or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.' (*Pitmon, supra,* 170 Cal.App.3d at p. 50, italics added.) . . .

"The *Pitmon* definition of 'duress' has been followed consistently for almost 20 years. (*People v. Cardenas* (1994) 21 Cal.App.4th 927; *People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1578-1579; *People v. Schulz* (1992) 2 Cal.App.4th 999, 1005; *People v. Hecker* (1990) 219 Cal.App.3d 1238, 1250; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 748.) The *Pitmon* definition also has been used to define the term 'duress' as it is used in the sexual offenses of aggravated sexual assault of a child in violation of section 269 (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13), forcible oral copulation in violation of section 288a, subdivision (c) (*People v. Senior* (1992) 3 Cal.App.4th 765, 775; *People v. Bergschneider* (1989) 211 Cal.App.3d 144, 154), forcible sexual penetration in violation of section 289 (*People v. Senior, supra,* 3 Cal.App.4th at p. 775), and enhancement for prior sex offenses under section 667.6, subdivision (d) (*People v. Senior, supra,* 3 Cal.App.4th at p. 775)."[19]

---

[19] We recognize that a number of these cited cases, *Pitmon*, *supra*, 170 Cal.App.3d 38, *People v. Hecker*, *supra*, 219 Cal.App.3d 1238, and *People v. Cochran*, *supra*, 103 Cal.App.4th 8, have subsequently been disapproved on another ground, along with two decisions by this court (*People v. Quinones* (1988) 202 Cal.App.3d 1154 and *People v. Bolander* (1994) 23 Cal.App.4th 155) and other cases (*People v. Cicero* (1984) 157 Cal.App.3d 465, *People v. Lusk* (1985) 170 Cal.App.3d 764, *People v. Mendibles* (1988) 199 Cal.App.3d 1277, and *People v. Neel* (1993) 19 Cal.App.4th 1784) for suggesting that the victim's consent is a defense to a charge of an aggravated lewd

*(Continued)*

The jury was instructed in this case in terms of the *Pitmon* definition in CALCRIM No. 1045: "'Duress' means a direct or implied threat of force, violence, hardship or retribution that is enough to cause a reasonable person of ordinary sensitivity to do or submit to something he or she would not otherwise do or submit to. Whether deciding the act was accompanied by duress, you are to consider all the circumstances including the age of the other person and his or her relationship to the defendant."[20]

In *Schulz*, *supra*, 2 Cal.App.4th 999, 1005, and *Senior*, *supra*, 3 Cal.App.4th 765, 775, this court stated: "Physical control can create 'duress' without constituting 'force.' 'Duress' would be redundant in the cited statutes if its meaning were no different than 'force,' 'violence,' 'menace,' or 'fear of immediate and unlawful bodily injury.'" After citing *Pitmon* and quoting its definition of "duress," *Schulz* continued: "As this court recognized in *People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, duress involves psychological coercion. (*Id.* at p. 238.) Duress can arise from various circumstances, including the relationship between the defendant and the victim and their relative ages and sizes. ([*Pitmon*]*, supra,* 170 Cal.App.3d at p. 51; *People v. Superior Court* (*Kneip*)*, supra,* 219 Cal.App.3d at p. 239.) 'Where the defendant is a family member and the victim is young, . . . the position of dominance and authority of the defendant and his continuous exploitation of the victim' is relevant to the existence of

---

touching. (*People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12 (*Soto*).) This disapproval was unrelated to the definition of "duress" used in these cases.

[20] The word "force" was omitted in the judge's reading of this definition of "duress." The jury was instructed orally and also given the instructions in writing. (CALCRIM No. 200.) To the extent that the reporter's transcript reflects a misreading of the written instructions, we will assume that the jury relied on the correct written instructions. (*People v. Wilson* (2008) 44 Cal.4th 758, 803 ["To the extent a discrepancy exists between the written and oral versions of jury instructions, the written instructions provided to the jury will control."].) The trial judge apologized for having a bad sinus condition before reading the instructions.

duress.  (*People v. Superior Court* (*Kneip*), *supra,* 219 Cal.App.3d at p. 239.)"  *Senior* went on to state that the "defendant's pulling the victim back and physically controlling her when she attempted, albeit ineffectually, to pull away during counts one, two, five, six, and seven suggested that greater physical resistance would be answered with greater physical force."  (*Senior*, *supra*, 3 Cal.App.4th at p. 775.)  Thus, exercising physical control can amount to an implied threat of greater force if there is resistance.

Defendant reasserts on appeal that D's "testimony about the timing of the pants ripping and the penetration is simply unclear" and that the incidents may be unrelated in time.  He also claims it is not clear whether he was lying on top of her at the time.  We regard this as contrived confusion about D's testimony.  Defendant parses D's answer to the question "What happened on that occasion?" as describing two or more occasions.  We have quoted her answer above (*ante*, in fn. 3 on p. 6).  What she said is readily and reasonably susceptible to the interpretation that she answered the question by describing what happened on that occasion, which involved sexual penetration after ripping the belt loop on her pants and lying on top of her.

The implied threat of greater force is a factor that distinguishes the facts from those in this court's opinion in *People v. Espinoza* (2002) 95 Cal.App.4th 1287 (*Espinoza*), on which defendant relies.  That opinion reasoned:  "The only way that we could say that defendant's lewd act on [12-year-old] L. and attempt at intercourse with L. were accomplished by duress is if the mere fact that he was L.'s father and larger than her combined with her fear and limited intellectual level were sufficient to establish that the acts were accomplished by duress.  What is missing here is the '"direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted."'  (*People v. Wilkerson* (1992) 6 Cal.App.4th 1571, 1578-1579.)  Duress cannot be established unless there is evidence that 'the victim['s] participation was impelled, at

45

least partly, by an implied threat . . . .' (*Id*. at p. 1580.) No evidence was adduced that defendant's lewd act and attempt at intercourse were accompanied by any 'direct or implied threat' of any kind. While it was clear that L. was afraid of defendant, no evidence was introduced to show that this fear was based on anything defendant had done other than to continue to molest her. It would be circular reasoning to find that her fear of molestation established that the molestation was accomplished by duress based on an implied threat of molestation." (*Espinoza,* at p. 1321.)

*Espinoza* did not involve an implied threat of force. Nor was there any implied threat of hardship such as disruption of the family. In that case, the five molests occurred during a one-month span during which a father repeatedly came into his 12-year-old daughter's bedroom in the early morning hours and made sexual contact apparently without saying anything to her about it other than asking if she still loved him, asking her to love him, and apologizing for attempting intercourse on the final occasion. (*Espinoza*, *supra*, 95 Cal.App.4th 1287, 1292-1295.)

In contrast, in this case, the molestations took place over a period of seven years, beginning when the victim was five or six years old. Defendant essentially told D more than once that if she told anyone about him molesting her, he would get in trouble. Left unsaid was that it would disrupt her mother's relationship with defendant and their household and family if she disclosed this sexual conduct. We regard this as an implied threat of hardship that would result if D refused to participate in the sexual conduct.

Applying the established definition of "duress" given to the jury, we conclude that there was substantial evidence that defendant employed duress in penetrating 13-year-old D with his finger based on the following combination of factors. He was her stepfather for a short time and served in a parental role as her mother's boyfriend for a significant period of time. He allegedly had been molesting her in different ways for over seven years. During that period of time, he warned her that he would get into trouble if she told anyone about it. When D and her mother resumed living with defendant in the summer

and fall of 2005, he became more forceful and aggressive with his sexual demands when they were in his bedroom. On the occasion of sexually penetrating her, he was so forceful about removing her jeans that he tore a belt loop. During part of that encounter, he lay on top of her, using his body weight to hold her in place. For all of these reasons, there was sufficient evidence to support a conviction of either count 15 or count 16.[21] Therefore, retrial on those charges is not barred.

## C. INSTRUCTIONS ON OFFENSES INCLUDED IN COUNTS 15 AND 16

Defendant did not request and the court did not give instructions on what defendant calls the lesser included offenses of "non-forcible lewd acts with a child (§ 288, subd. (a)) and non-forcible penetration of a child with a foreign object (§ 289, subd. (j))." Nevertheless, on appeal defendant contends that the trial court breached its sua sponte duty to give such instructions for count 15, charging penetration with a foreign object, and count 16, charging aggravated sexual assault by penetration with a foreign object.

"We apply the independent or de novo standard of review to the failure by the trial court to instruct on an assertedly lesser included offense. [Citation.] A trial court must instruct the jury sua sponte on a lesser included offense only if there is substantial evidence, '"that is, evidence that a reasonable jury could find persuasive"' [citation], which, if accepted, '"would absolve [the] defendant from guilt of the greater offense" [citation] *but not the lesser*' [citation]." (*People v. Cole* (2004) 33 Cal.4th 1158, 1218.) "[A] lesser offense is necessarily included in a greater offense if either the statutory elements of the greater offense, or the facts actually alleged in the accusatory pleading,

---

[21] As we concluded in part 4A, however, for other reasons he cannot be convicted of both counts.

include all the elements of the lesser offense, such that the greater cannot be committed without also committing the lesser." (*People v. Birks* (1998) 19 Cal.4th 108, 117-118.)

We must examine the pleading and the elements of these other offenses to determine if they are lesser included either by the statutory elements or the pleadings.

One of the elements of lewd touching in violation of section 288, subdivision (a) (as the jury was instructed in this case regarding other counts) is that "the Defendant committed the act with the intent of arousing, appealing to or gratifying the lust, passion or sexual desires of himself or the child." (CALCRIM No. 1110.) The jury was also instructed that lewd touching involves a specific intent. (CALCRIM No. 251.) The specific sexual intent required for lewd touching is not an element of sexual penetration in violation of section 289, so lewd touching is not a lesser offense included in section 289 for purposes of jury instructions. (Cf. *People v. Griffin* (1988) 46 Cal.3d 1011, 1030 ["a lewd act on a child is not a necessarily included offense of either rape or sodomy."].) With respect to the accusatory pleading test, there was no allegation in count 16 that the sexual penetration was accompanied by any specific intent.

Defendant relies on *People v. Arevalo-Iraheta* (2011) 193 Cal.App.4th 1574 (*Arevalo-Iraheta*) for the proposition that a violation of section 288, subdivision (a) was a lesser included offense of aggravated sexual assault under section 269 (count 16). As defendant notes, the Attorney General does not respond to this assertion.

The issue on appeal in *Arevalo-Iraheta* was whether the prosecution was entitled to amend the information midtrial to add five counts of 288 as lesser offenses to the already pleaded five counts of sexual assault by rape on a child under section 269, subdivision (a)(1). (*Id.* at p. 1580.) In the course of upholding the amendment, the appellate court noted, "As defendant himself equivocally admits, the section 288, subdivision (a) charges in counts 6 through 10 were lesser, necessarily included offenses of the aggravated rape of a child charges in counts 1 through 5." (*Arevalo-Iraheta*, *supra*, 193 Cal.App.4th at p. 1581.)

48

If the defendant's equivocal concession in *Arevalo-Iraheta* was based on how the section 269 violations were pleaded in that case, the decision is factually distinguishable. If the defendant's concession was based on the elements of the section 269, subdivision (a)(1) in that case, it was mistaken. *People v. Griffin*, *supra*, 46 Cal.3d 1011, 1030, compels the conclusion that the specific intent of sexual arousal is not an element of rape. The same is true of the crime of foreign object penetration. We see no specific intent allegation in count 16 that obliged the trial court to instruct on nonforcible lewd contact as a lesser included offense.

In 2005, section 289 provided in part: "(j) Any person who participates in an act of sexual penetration with another person who is under 14 years of age and who is more than 10 years younger than he or she shall be punished by imprisonment in the state prison for three, six, or eight years." (Stats. 2002, ch. 302, § 5, p. 1209.) Defendant contends that this crime "is a lesser-included offense of forcible penetration with a foreign object[, count 15,] under the 'accusatory pleading' test." Presumably defendant is eschewing the elements test because the nonforcible crime of former section 289, subdivision (j) includes age limits and age discrepancies not required for the greater offense of violating of former section 289, subdivision (a). (See *People v. Scott* (2000) 83 Cal.App.4th 784, 794.)

Defendant asserts, "[t]he amended information alleged that, at the time of counts 15 and 16, [D] was under the age of 14 and that [D] was at least 10 years younger than [defendant]." Though defendant disclaims suggesting that a violation of section 289, subdivision (j) is a lesser included offense of count 16, he cites to the allegations in the amended information of both count 15 (§ 289) and count 16 (§ 269, subd. (a)(5)) to establish that it was a lesser offense of count 15.

A defendant, however, is not entitled to pick and choose from among the factual allegations in different counts to support an argument that lesser included offense instructions were omitted on one count. "Consistent with the primary function of the

49

accusatory pleading test—to determine whether a defendant is entitled to instruction on a lesser uncharged offense—we consider *only* the pleading for the greater offense." (*People v. Montoya* (2004) 33 Cal.4th 1031, 1036.)  The purported greater offense allegations of section 289 in count 15 did mention that the victim was 13 years old in the fall of 2005, but the count alleged nothing about defendant's age.

Because section 289, subdivision (j) was not a lesser included offense of section 289, subdivision (a) under either test, we conclude that the trial court breached no sua sponte obligation to instruction on that offense.

**5. DISPOSITION**

The judgment is reversed.

_____

Márquez, J.

WE CONCUR:

_____

Premo, Acting P.J.

_____

Mihara, J.

50